James **SCHALK**; Betty Addison; William Glass; William Westbrook; and Arden Edlund, on behalf of themselves and all others similarly situated; Vincent Kniat; and Arthur Belasco, on behalf of themselves only, Plaintiffs,

v.

**TELEDYNE, INC.**, a Delaware corporation; and Teledyne Industries, Inc., a California corporation, Defendants.

No. 1:90–CV–460.

United States District Court, W.D. Michigan, S.D.

Nov. 30, 1990.

---

William A. Wertheimer, Jr., Detroit, Mich., for plaintiffs.

Peter J. Armstrong, Thomas J. Barnes, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

This matter is before the Court on plaintiffs' motion for a preliminary injunction. Plaintiffs [1] bring their motion pursuant to Fed.R.Civ.P. 65(a). This is a proposed class action,[2] involving a dispute about retiree health and life insurance benefits. The principal issue is whether defendants have a contractual right to terminate or reduce collectively bargained health and life insurance agreements. Plaintiffs allege that defendants have reduced their insurance benefits in violation of § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 and § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. The Court heard oral argument on plaintiffs' motion on November 28, 1990.

## FACTS

Defendant, Teledyne, Inc., is a large international conglomerate. Defendant, Teledyne Industries, Inc., is a wholly-owned subsidiary which operates a number of former Continental Motors plants under various d/b/a's, including Teledyne Continental Motors, General Products in Muskegon, MI; Teledyne Continental Motors, Industrial Products in Muskegon, MI; Teledyne Continental Motors, Aircraft Products in Alabama; and Teledyne CAE in Toledo, OH; Teledyne NEOSHA in Missouri and Teledyne Wisconsin Motor.[3] Teledyne has been a party to successive multi-plant collective bargaining agreements with the United Automobile, Aerospace & Agricultural Implement Workers of America ("UAW") and various UAW locals. Since 1968 (under Teledyne's predecessor, Continental Motors), the collective bargaining agreement has included a master insurance agreement that has provided for health insurance for retirees and their surviving spouses and life and accidental death and

---

1. Plaintiffs state that they are not seeking relief on behalf of two plaintiffs, Vincent Kniat and Arthur Belasco, who retired during the current strike. Accordingly, any relief granted here does not apply to these two plaintiffs.

2. Plaintiffs have not requested, or been granted, at this time, certification for a class action pursuant to Fed.R.Civ.P. 23.

3. Hereinafter defendants and their various d/b/a's will be referred to as "Teledyne."

dismemberment insurance for early, special early and disability retirees.

The most recent collective bargaining agreement between Teledyne and the UAW expired on its terms on June 24, 1989, and Teledyne and the UAW have, since June, been bargaining over the terms of a successor collective bargaining agreement. On February 5, 1990, Teledyne sent a letter to its Muskegon retirees which stated that effective March 1, 1990, their health insurance would be terminated and a new plan, the "Teledyne Plus Plan" would be substituted. Also, it stated that any increase in premiums in 1991 or thereafter would be paid half by Teledyne and half by the retiree. Complaint Exhibit ("Ex.") B. On February 15, 1990, the UAW began a strike at Teledyne at all the locations described above. On the same day, Teledyne sent a letter to the UAW stating that health and life insurance programs would no longer be paid by Teledyne for striking employees, retirees or surviving spouses. On February 22, 1990, Teledyne sent a letter to retirees from its Muskegon plants stating that their health insurance benefits would cease as of March 31, 1990 and that they could continue coverage by electing to pay their own premiums on a monthly basis. Complaint Ex. C. Apparently, Teledyne never followed through on this threat, but informed retirees that it would continue "Teledyne Plus Plan" coverage for an indefinite period while retaining the right to terminate their coverage at any time.

On March 1, 1990, at its Muskegon plants only, Teledyne terminated the old health insurance program for retirees and surviving spouses and substituted the "Teledyne Plus Plan." Under the Teledyne Plus Plan, retirees are, for the first time, required to pay deductibles and co-pays with a maximum annual out-of-pocket cost of $1,200 for an individual and $1,900 for a family.[4]

Additionally, on March 1, 1990, Teledyne informed early, special early, and disability retirees that it was terminating their life and accidental death and dismemberment insurance unless the retirees elected to pay their own premiums.[5] Teledyne has carried through with this threat, although only at its Muskegon location.

STANDARD

Preliminary Injunction Standard

In deciding whether to grant or deny a preliminary injunction, the Court must balance four well-known factors. These factors are:

1. Whether the plaintiff has shown a strong or substantial likelihood of success on the merits;

2. Whether the plaintiff has shown irreparable injury;

3. Whether the issuance of a preliminary injunction would cause substantial harm to others; and

4. Whether the public interest would be served by issuing a preliminary injunction.

*Forry, Inc. v. Neundorfer, Inc.*, 837 F.2d 259, 262 (6th Cir.1988); *Mason County Medical Association v. Knebel*, 563 F.2d 256, 261 (6th Cir.1977).

The purpose of the preliminary injunction is to preserve the status quo pending final determination of the lawsuit. *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). Preliminary injunctions are addressed to the discretion of the district court. *Synanon Foundation, Inc. v. California*, 444 U.S. 1307, 100 S.Ct. 496, 62 L.Ed.2d 454 (1979). This type of relief is an extraordinary remedy best used sparingly. *Roghan v. Block*, 590 F.Supp. 150 (W.D.Mich.1984). The Sixth Circuit has held that an evidentiary hearing is not necessary on a preliminary injunction motion when, as here, no triable issues of fact are involved. *United*

---

**4.** This cost is broken down as follows: deductibles of $200 per person, $400 per family and $100 per hospital confinement; co-pays of 20%, up to a maximum of $1,000 per person and $1,500 per family.

**5.** Teledyne does not provide life and accidental death and dismemberment insurance to other categories of retirees. Life and accidental death insurance terminates at age 65 for all employees unless they elect to pay their own premiums.

**1264**

*States v. McGee,* 714 F.2d 607 (6th Cir. 1983).

The Sixth Circuit has cautioned courts that they should not view the four factors as prerequisites to relief, but rather as factors to be balanced. *In re DeLorean Motor Co.,* 755 F.2d 1223 (6th Cir.1985). Thus, a court can enter a preliminary injunction if it finds that the plaintiff "at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 105 (6th Cir. 1982). "Where the burden of the injunction would weigh as heavily on the defendant as on the plaintiff [, however], the plaintiff must make a showing of at least a 'strong probability of success on the merits' before a trial court would be justified in issuing the order." *Frisch's Restaurant, Inc. v. Shoney's, Inc.,* 759 F.2d 1261, 1270 (6th Cir.1985). Also, as the strength of showing as to irreparable harm increases, the necessity to show likelihood of success on the merits decreases. *Ardister v. Mansour,* 627 F.Supp. 641, 644 (W.D.Mich. 1986). Yet in spite of the overall flexibility of the test for preliminary injunctive relief, the Sixth Circuit has stated that irreparable harm element is to be analyzed carefully. In *Friendship Materials, Inc. v. Michigan Brick, Inc.,* the court said:

> Despite the overall flexibility of the test for preliminary injunctive relief, and the discretion vested in the district court, equity has traditionally required [a showing of] irreparable harm before an interlocutory injunction may be issued.

679 F.2d 100, 103 (6th Cir.1982).

## DISCUSSION

*Likelihood of Success on the Merits*

■ Plaintiffs submit that they have a high likelihood of succeeding on the merits in this matter. In support of this they argue that there is substantial evidence that retiree health benefits are lifetime benefits. Looking at the contract at issue, plaintiffs submit that although the contract does not specifically state that retiree health benefits are lifetime, case law as well at Teledyne's own statements in the past lead to the conclusion that such benefits are lifetime.

In *U.A.W. v. Yard-Man, Inc.,* 716 F.2d 1476 (6th Cir.1983), the Sixth Circuit addressed the question of whether retirees' life and health insurance benefits terminated at the expiration of the current collective bargaining agreement or whether they continued beyond the expiration of the collective bargaining agreement. The court first identified the appropriate starting point in examining the duration of retiree benefits:

> [W]hether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement depends upon the intent of the parties.

*Id.* at 1479. To determine the intent of the parties, the court "first look[ed] to the explicit language of the collective bargaining agreement for clear manifestations of intent." *Id.* It also stated that:

> [a] court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties.

*Id.* at 1479–1480. In finding that the application of these basic rules led to the conclusion that the parties intended to create nonterminating lifelong retiree insurance benefits, the *Yard-Man* court found that the phrase "When the former employee has attained the age of 65 years then the Company will provide insurance benefits equal to the active group benefits ... for the former employee and his spouse" was ambiguous at least as to duration. Accordingly, the court looked to other provisions of the collective bargaining agreement and determined that Yard-Man intended to create vesting retiree insurance benefits. The court stated:

> [E]xamination of the context in which these benefits arose demonstrates the likelihood that continuing insurance benefits for retirees were intended. Benefits for retirees are only permissive not mandatory subjects of collective bargain-

ing. As such, it is unlikely that such benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations.... Further, retiree benefits are in a sense "status" benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained. Thus, when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree. This is not to say that retiree insurance benefits are necessarily interminable by their nature. Nor does any federal labor policy identified to this Court presumptively favor the finding of interminable rights to retiree insurance benefits when the collective bargaining agreement is silent. Rather, as part of the context from which the collective bargaining agreement arose, the nature of such benefits simply provides another inference of intent. Standing alone, this factor would be insufficient to find an intent to create interminable benefits.

*Id.* at 1482. (cites omitted). The reasoning, and the outcome of *Yard–Man* has been followed in a number of cases in this Circuit. *Smith v. ABS Industries, Inc.*, 890 F.2d 841 (6th Cir.1989) (retiree benefits were vested under hospital medical plans included in collective bargaining agreement); *Policy v. Powell Pressed Steel Co.*, 770 F.2d 609 (6th Cir.1985) (employer's duty to provide health benefits to retirees did not end with expiration of collective bargaining agreement); *International Union, U.A.W. v. Cadillac Malleable Iron Company, Inc.*, 728 F.2d 807 (6th Cir.1984) (on basis of entire record, district court correctly concluded that retiree life and health insurance not affected by expiration of collective bargaining agreements); *United Paper Workers v. Muskegon Paper Box Co.*, 704 F.Supp. 774 (W.D.Mich.1988) (retiree life and insurance benefits contained in collective bargaining agreements vested and plant closing agreement was ineffective in terminating benefits).

Defendants contest plaintiffs application of *Yard–Man* and its progeny, claiming that the relevant contract language does not support plaintiffs' claim. Defendants point out that the Insurance Agreement at issue contains a duration provision which applies to the retiree health, life and disability insurance benefits at issue. The section provides that the Insurance Agreement will remain in effect until June 25, 1983, and thereafter if no notice of intent to terminate or modify is given. If either party desires to terminate the Agreement it shall give 60 days written notice of its intent, prior to June 25 of the subsequent year, and a conference will be arranged to negotiate the proposals. Further, if motive or intention to modify has been given, the Agreement may be terminated by either party on thirty days written notice given on or after the next January 1.

The existence of such a durational clause as a bar to lifelong benefits was rejected in *Yard–Man.* The court stated that the existence of a general durational clause which provided that the collective bargaining agreement should remain in effect until a certain date did not demonstrate an intent that all benefits described in the agreement also terminated at that date. Noting that the durational clause did not specifically refer to the duration of benefits, but rather the duration of the agreement, the court found that the intent evidenced in the agreement that retiree health benefits were for life, took precedence over a non-specific general clause. *Yard–Man,* 716 F.2d at 1482–83. This line of thought was followed by Judge Gibson, of this district, in *United Paper Workers,* where he stated that the existence of a provision stating that the agreement at issue would remain in effect until August 1, 1986 and from year to year thereafter, unless terminated, amended or modified by mutual agreement of the parties, spoke only to the termination of the *agreement* and not expressly to termination of *benefits. United Paper Workers,* 704 F.Supp. at 777–8; *see also Weimer v. Kurz–Kasch,* 773 F.2d 669, 676 (6th Cir.1985).

In *Musto v. American General Corp.,* 861 F.2d 897 (6th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989), which defendants cite to in support of their argument, the plaintiffs were non-union employees who had not "collectively bargained" for the benefits at issue. Further the agreement under consideration contained an express reservation of the right to change the plan at any time. *Turner v. Local 302, Teamsters,* 604 F.2d 1219 (9th Cir.1979) and *UAW v. Roblin,* 561 F.Supp. 288 (W.D.Mich.1983) were both decided before the *Yard–Man* case. Further, in *Roblin,* the court specifically noted that it had heard no credible evidence that the parties understood the agreements at issue as providing lifetime benefits. *Id.* at 299. Such is not the case in the facts currently before me. *See* discussion on extrinsic evidence *infra.* In *McNabb v. Michigan Consolidated Gas Co.,* 656 F.Supp. 866 (E.D. Mich.1987), the plaintiff claimed that ERISA, not a contract, prohibited an employer from unilaterally reducing retiree life insurance benefits. Finally, in *Anderson v. Alpha Portland Industries, Inc.,* 836 F.2d 1512 (8th Cir.1988), the Eighth Circuit specifically disagreed with *Yard–Man.* However, the most recent Sixth Circuit opinion on the subject, *Smith v. ABS Industries, Inc.,* 890 F.2d at 845–46 adopts the *Yard–Man* court's reasoning. Of course, the court is bound by the Sixth, not the Eighth, Circuit.

In addition to asserting that the case law prescribes a finding of a high likelihood of success on the merits, plaintiffs also point to extrinsic factors in support of their claim. In *Yard–Man,* the court noted that the parties presented no extrinsic evidence of intent, and thus did not reach the question of whether such evidence was admissible. Later Sixth Circuit cases, however, have approved the admission of extrinsic evidence of intent.[6] Specifically in *Cadillac Malleable Iron,* 728 F.2d at 808–809, the Sixth Circuit noted that the district court correctly relied on the entire record, including the fact that defendants had paid

benefits during three strikes as evidence that retiree insurance benefits are lifetime in nature. *See also Smith,* 890 F.2d at 846.

Plaintiffs in this case point to the fact that during strikes in 1977, 1980 and 1983, Teledyne continued retiree insurance benefits. Plaintiffs also submit proof of statements made by Teledyne officials indicating that retiree health insurance benefits are provided for life. Specifically, in 1986, Teledyne submitted an affidavit from its then manager of labor relations and benefits to a federal judge in Wisconsin. That affidavit stated in part that "[h]ealth insurance benefits for life are provided to all bargaining unit retirees." Plaintiffs' Ex. E. Similarly, in 1987, J.L. Johnson, Vice President of Teledyne in Personnel and Industrial Relations, sent letters to at least three retirees informing them that "[a]s a retiree of Teledyne Continental Motors, the company provides medical and prescription drug coverage for the remainder of your lifetime." Plaintiffs' Exs. F, H, I. Teledyne made a similar statement in a form document distributed at its CAE facility:

> Basic Hospital–Surgical–Medical insurance benefits provided ... for life for you and eligible dependents. Prescription drug coverage continued for life for you and eligible dependents.

Plaintiffs' Ex. G. Defendant attempts to dismiss the impact of this extrinsic evidence, claiming that benefits during strikes were provided out of its "extreme generosity" to retirees, in an attempt to avoid "alienation" of retirees, and a desire to avoid "administrative considerations" which would offset the savings it would have realized. Defendants' brief in opposition at 31. As to the "admissions" of Teledyne employees that retiree health benefits are for life, defendants assert that they are unpersuasive, and made in contexts other than that now facing this Court.

The defendants also claim that a collectively bargained for increase in the prescription drug co-pay from $2 to $5 is proof

---

**6.** Defendants argue that such extrinsic evidence is inadmissible. However, extrinsic evidence is allowed where both parties have offered plau-

sible interpretations of an agreement. *Smith v. ABS Industries,* 890 F.2d 841, 846 n. 1 (6th Cir.1989).

that retiree benefits were not "for life." I am unpersuaded. As defendants themselves admit, this was a collectively bargained for change that no one objected to. That is certainly not the case with the change at issue.

Considering the facts before this Court as a whole, I am persuaded that *Yard–Man* and its progeny are applicable and that plaintiffs' have met their burden of showing a likelihood of success on the merits.

*Irreparable Injury*

■ While there is no set definition of "irreparable injury," *see e.g., City of Benton Harbor v. Richardson*, 429 F.Supp. 1096 (W.D.Mich.1977), the moving party must demonstrate a noncompensable injury, for which there is no legal measure of damages. *Merrill, Lynch, Pierce, Fenner & Smith v. E.F. Hutton*, 403 F.Supp. 336, 343 (E.D.Mich.1975) (citations omitted).

In response to plaintiffs' motion, defendants argue that plaintiffs had failed to offer proof of irreparable harm. In support of this, defendants claim that the current Teledyne Plus Plan offers coverage which is "substantial and in many respects *better* than the prior plan...." Brief in Opposition at 35.[7] This argument is of no consequence. It is not this Court's task to decide which health plan is "better."

■ On the issue of health insurance benefits, I believe that plaintiffs have submitted strong evidence of irreparable harm. It is self-evident, to the Court at least, that a cost shift to retirees of what defendants themselves claim will be approximately $90,000 per month, Brief at 38, constitutes irreparable harm. Turning to individual cases, plaintiffs have provided the affidavits of former employees, each of whom is living with their spouse on a monthly income of $1,000 to $1,520. One of these retirees, Robert Hansen, states that his wife just had a hernia operation for which they paid the $200 deductible and that she is scheduled to have her aortic heart valve replaced and that he does not know where they will get the money for pay the $100 hospital deductible and the $1,000 co-pay maximum. He indicates that he and his wife live on $1,520 per month and their entire saving consists of about $4,000 in a certificate of deposit earmarked to be used for burial expenses. Plaintiffs' Supplemental Brief Ex. B.

Defendants counter Mr. Hansen's affidavit, and others submitted by the plaintiffs, by stating that when Medicare coverage is factored into the analysis, the out-of-pocket costs to the retirees may be less than the $1,200 or $1,900 limit. For instance, Karen Oakes, defendants' Insurance Administrator, states in her supplemental affidavit, that the Hansen's actual out-of-pocket expenses for both her hernia operation and her upcoming heart valve operation would be $658.62 after Medicare payments were taken into account. This may well be an accurate analysis of the Hansen's situation. However, the Court believes that, based on the argument of plaintiffs' counsel at the hearing, this figure is due partly to the fact that the two hospitals in Muskegon have agreed to a "special arrangement" in which they apparently bill Teledyne employees only 10% instead of 20% on the co-pay required under Medicare. Obviously, the option of choosing one of these hospitals does not exist for retirees who may live outside the Muskegon area. Furthermore, on the income reported by the Hansens, an additional $658 yearly payment is clearly a substantial additional expense. The addition of Medicare payments to the analysis of this matter does not change the fact that an additional yearly expense of possibly as much as $1,900, or even as low as $592[8] under the Teledyne Plus Plan, would im-

---

**7.** Defendants also spend a considerable amount of their brief arguing that the Teledyne Plus Plan is better, [Brief at 35] or at least as good as [Brief at 3] insurance offered to "most plant retirees in the Muskegon Area." Brief at 3. This discussion is, of course, totally irrelevant. The adequacy of other retiree insurance programs in Muskegon has nothing to do with whether Teledyne must continue to supply life-time health and life insurance benefits at the level collectively bargained for.

**8.** Counsel for the plaintiffs and defendants represented at oral argument that the current hospital deductible under Medicare was $592 per hospital stay and that this figure was going up to $628 in 1991.

pose a financial hardship on this couple. The Court recognizes the distinct possibility that retirees living on such limited means might chose to forego necessary medical treatment if they are required to pay co-pays and deductibles which are obviously well outside their means.

Further, I am convinced that the uncertainty posed by the lack of knowing just how much money will be needed to cover medical expenses under the current Teledyne Plus Plan also poses irreparable harm in the financial planning burden which it places on plaintiffs. Even if there is the possibility that their out-of-pocket expenses may be less than $1,200 or $1,900, plaintiffs are left not knowing that fact until the scenario by which they meet their co-pays and deductibles has occurred. In other words, plaintiffs cannot sit down with an annual budget and budget a certain amount of money which will cover their medical expenses unless they budget the maximum amount of $1,200 or $1,900. For persons living on a fixed income, budgeting is an important tool. The uncertainty and worry caused by the Teledyne Plus Plan is also a form of noncompensable injury for retirees living on a fixed income.

On the issue of life and accidental death and dismemberment insurance, the Court also believes that plaintiffs have shown the existence of irreparable harm as to those employees who are under 65 years of age, and early, special early or disability retirees. Under the current plan, these retirees are required to pay their own premiums if they wish to continue their coverage. Defendants' counsel stated at oral argument that these premiums ranged from approximately $15.00 to $18.00 per month. This means that these plaintiffs are currently required to pay an additional $180 to $216 per year. This is not a small amount of money to persons living on a fixed income. The loss of this insurance also means that these retirees have to face the choice of perhaps going without a basic necessity in order to assure that money is available for loved ones after their death, or possibly to pay their funeral expenses. Although it is clear that a much smaller number of retirees are affected by this than are affected by health insurance benefits, the loss of this benefit until age 65, and the accompanying peace of mind, cannot be compensated for by money damages after the fact.

Despite defendants' arguments to the contrary, I am convinced that plaintiffs have shown the presence of irreparable harm as regards loss of health benefits and life and accidental death and dismemberment benefits.

*Substantial Harm to Others*

In balancing the harm that Teledyne will suffer if an injunction is entered by the Court against the harm that plaintiffs will suffer if their request is denied, I note that Teledyne's only argument is that it estimates it will cost the company an additional $90,000 per month if it is forced to reinstate the prior coverage. I am unconvinced that this harm outweighs that of a retiree forced to go without medical care, or forced to choose between the basic necessities of life in order to pay his or her medical deductibles and co-pays or life insurance. Plaintiffs have also met their burden on this issue.

*Public Interest*

I believe that the public interest lies in protecting the legitimate expectations of retirees that their health insurance will be provided for the rest of their lives and life insurance until age 65. Undoubtedly, the public interest also lies in the preservation of a healthy population. Further, ERISA, under which plaintiffs' bring their action, provides that the policy behind it is to "protect the interests of participants in employee benefit plans … by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, … by providing for appropriate remedies, sanctions and ready access to the Federal Court." 29 U.S.C. § 1001(b). When an act is prohibited by a statute, such as ERISA, the public interest is best served by preventing the prohibited act. *U.S. v. Nutrition Service, Inc.*, 227 F.Supp. 375 (W.D.Pa.1964), *aff'd* 347 F.2d 233 (3rd Cir.1965). ERISA specifically pro-

vides that injunctive relief is an available remedy. 29 U.S.C. § 1132(a)(3).

Defendants argue that there are no public interests at stake in this case. Opposition Brief at 38. In the alternative, they argue that the public interest lies in seeing that their company remains a viable economic force and source of employment in Muskegon. This is undoubtedly true. Nevertheless, defendants have presented no evidence showing that the preliminary injunction which plaintiffs request will cause them to go out of business.

*Other Defenses*

In their over-length brief, which is long on argumentative and pejorative rhetoric, defendants raise a number of other issues, none of which I find to be persuasive. First, defendants claim that the union is an essential party to this action and must be joined before the court makes any ruling on the plaintiffs' motion. However, after a hearing, Magistrate Rowland denied the defendants' motion for Joinder on September 19, 1990. Defendants appealed this Order, and I denied defendants' appeal.

Defendants also claim that plaintiffs' delay in filing this action effectively negates any need for preliminary injunctive relief. Defendants claim that the Teledyne Plus Plan was implemented on February 5, 1990 and plaintiffs waited 3½ months to file suit. This is a mischaracterization at best. Although it is not clear to the Court whether the Teledyne Plus Plan was instituted on March 1, 1990 or April 1, 1990; *See* Complaint ¶ 47 (indicating that Teledyne reduced benefits on March 1, 1990); Plaintiffs' Reply brief at 6 (indicating that Teledyne Plus Plan was instituted April 1, 1990), it is clear that on February 5, 1990 Teledyne sent a letter stating that on March 1, 1990 the Teledyne Plus Plan would become effective. To now claim that the Teledyne Plus Plan was implemented on February 5, 1990 is clearly erroneous. Furthermore, I do not find that the alleged "delay" in requesting injunctive relief was unreasonable in any way.

*Security*

■ One final issue remains to be addressed. In *Roth v. Bank of the Common-wealth*, 583 F.2d 527 (6th Cir.1978), the Sixth Circuit held that a trial court must exercise the discretion required of it by Fed.R.Civ.P. 65(c) and expressly consider the question of requiring a bond before issuing a preliminary injunction. *Roth*, 583 F.2d at 539. However, it also recognizes that the actual requirement of a bond is discretionary with the trial judge. *Id.;* *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 100 (6th Cir.1982) (amount of security given by applicant for an injunction is matter of discretion for trial court, which may require no security at all).

In this case, plaintiffs represent that they would be unable to post more than a nominal bond. They relate that the Executive Board of the UAW voted against posting a bond in this matter earlier in the year. Plaintiffs' brief on security at 1–2. However, I believe that the posting of a bond is necessary in this case. Certainly, there is a large amount of money involved. Accordingly, a preliminary injunction will issue upon plaintiffs posting a bond in the amount of $50,000.

## ORDER

In accordance with the opinion entered this date;

IT IS HEREBY ORDERED that plaintiffs' motion for a preliminary injunction is GRANTED;

IT IS FURTHER ORDERED that upon the posting of a $50,000 security bond by plaintiffs, defendants, their agents and all persons in active concert or participating with them, shall provide plaintiffs with health insurance benefits as specified in the insurance program portion of the collective bargaining agreement which allegedly expired on June 24, 1989. It shall also provide life and accidental death and dismemberment insurance for early, special early, and disability retirees as specified in this insurance program.

This Order shall remain in effect until further order of this Court.