**Robert D. SPRAGUE, et al., Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**No. 90–CV–70010.**

United States District Court,
E.D. Michigan, S.D.

July 29, 1991.

Raymond C. Fay, Bell, Boyd & Lloyd, Washington, D.C., J. Douglas Peters, David R. Parker, Charfoos & Christensen, Detroit, Mich., Roger J. Thomas, Law Office of Michael Gordon, Washington, D.C., for plaintiffs.

Robert F. Walker, Ethan Lipsig, Elliot K. Gordon, Paul, Hastings, Janofsky & Walker, Santa Monica, Cal., David M. Davis, Daniel G. Galant, General Motors Corp., Detroit, Mich., Terence V. Page, Birmingham, Mich., for defendant.

## OPINION AND ORDER

FEIKENS, District Judge.

This is a compelling case for interlocutory appeal. I certify it herewith, pursuant to 28 U.S.C. § 1292(b). A putative plaintiff class of more than 84,000 non-union ("salaried") retirees of the General Motors Corporation ("GM"), sues under the Employee Retirement Income Security Act of 1974 ("ERISA"). They seek a judgment which would require GM to furnish them with basic health care coverage at no cost to them for their lifetimes, and for the lifetimes of their surviving spouses. At issue is whether plaintiffs' health care benefits vested, *i.e.*, became immutable upon retirement, or whether GM is free to reduce those benefits.

In this opinion I find that benefits under GM's health care plan for salaried retirees (the "plan") did not vest upon retirement. But I find that GM may have entered into bilateral contracts to provide such benefits to approximately 40,000 so-called "early retirees." Accordingly, I dismiss the claims of general retirees, but allow the claims of early retirees to proceed.

It does not appear to be wise or expedient to try this protracted case before there is a resolution of applicable law. Specifically, I find that there is substantial uncertainty in the case law whether ERISA

preempts early retirees from claiming that GM bilaterally contracted with them to vest health care benefits that were otherwise not vested under general plan documents. If plaintiffs are allowed to proceed on this claim, it will be necessary to conduct extensive discovery to determine the terms and conditions of 40,000 alleged bilateral contracts. Before going down that path, it is prudent to determine whether the U.S. Court of Appeals for the Sixth Circuit will agree that the early retirees can state a cause of action. Accordingly, I certify the following questions of law:

1. Did the district court properly find, as a matter of law, that benefits under GM's health care plan for salaried retirees did not vest upon retirement?

2. If so, can early salaried retirees of GM state a cause of action under ERISA to enforce claimed vested health care benefits evidenced by bilateral contracts?

Although I do not believe that there is a substantial difference of opinion in the case law as to the first question, it must be reached before the second question can be resolved because the early retirees need not rely on bilateral contracts if the Sixth Circuit finds that they have vested benefits under general plan documents. I therefore certify both questions for interlocutory appeal.

## I. *Procedural Background*

On August 8, 1989, plaintiff Robert D. Sprague, together with 113 other named plaintiffs, filed a complaint in the United States District Court for the Central District of California against their former employer, GM, alleging that GM had violated their rights under ERISA, 29 U.S.C. §§ 1001 *et seq.* The named plaintiffs filed the complaint as a purported class action pursuant to Federal Rule of Civil Procedure 23, and claim to represent over 84,000 salaried retirees or their surviving spouses. On November 27, 1989, Judge William D.

Keller ordered the action transferred to this court pursuant to 28 U.S.C. § 1404(a).

The essence of the complaint is that GM violated the terms of its health care plan, and thus ERISA §§ 402, 502(a)(1)(B) and 502(a)(3), 29 U.S.C. §§ 1102, 1132(a)(1)(B) and 1132(a)(3), when it reduced or eliminated certain health care coverages in 1988. (Complaint, Count II).

Plaintiffs also claim that the changes implemented in 1988 constitute a breach of GM's fiduciary duties arising under Section 404 of ERISA, 29 U.S.C. § 1104. (Complaint, Count III). Plaintiffs assert separate causes of action, arising from the same changes in health care coverages, based on breach of contract and equitable or promissory estoppel claims arising under "ERISA federal common law." (Complaint, Counts IV and V). Finally, plaintiffs allege that GM violated the requirements of ERISA by failing to maintain its health care plan pursuant to a written instrument, ERISA § 402(a), 29 U.S.C. § 1102(a); refusing or failing to supply requested information, ERISA § 502(c), 29 U.S.C. § 1132(c); and failing to comply with requirements for summary plan descriptions.

The matter is before me on cross-motions for partial summary judgment.[1] GM moves for summary judgment on Count II, arguing that the coverage modifications instituted in 1988 do not constitute violations of its plan because retirees did not have vested benefits under the plan.

Plaintiffs move for summary judgment on Counts IV and V of the complaint in favor of early retirees based on bilateral contracts which allegedly contain GM's promise to provide early retirees with vested health care benefits.

For reasons set forth below, GM's motion for summary judgment is GRANTED as to general retirees but DENIED as to early retirees. Plaintiffs' motion is DENIED.

---

1. This opinion also addresses, in part, GM's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II. *Facts*

In 1964, GM began to pay the full cost, *i.e.*, the insurance premiums, for basic hospital, medical, and surgical insurance for salaried retirees. In 1968, this benefit was extended to most surviving spouses. GM also offered salaried retirees and surviving spouses an additional layer of coverage under its Comprehensive Medical Expense Insurance Program (CMEIP).[2] CMEIP participants were required to pay co-payments, deductibles, and a portion of the insurance premiums.

GM provided these coverages through arrangements it had with various private insurance companies throughout the country. Some of these arrangements were memorialized in written contracts of insurance between the carrier and GM; others were not. All insurance carriers provided participants with certificates of insurance detailing the terms of coverage.

When GM became self-insured in 1985, the use of insurance certificates was discontinued. Thereafter, GM drafted a document entitled "The General Motors Health Care Insurance Program for Salaried Employees." This document, together with subsequent writings which announced changes in coverage, describe GM's post-1985 health care coverage plan.

The primary way GM has communicated its health care coverage plan to employees and retirees is through summary booklets. Prior to 1974 GM periodically published a booklet entitled "The GM Insurance Program For Salaried Employees." With the enactment of ERISA in 1974, the method of supplying participants with plan summaries was changed. Thereafter GM published a plan summary entitled "Highlights of Your GM Benefits." In addition, commencing in 1977, when summary plan description ("SPDs") were first required by ERISA, GM began to publish a booklet entitled "Your Benefits in Retirement," which served and continues to serve as the summary plan description for benefits provided to salaried employees.

Several of the summary booklets distributed to GM salaried employees and retirees contain statements informing participants that GM will pay the full cost of basic health care coverage during their retirement. For example, the 1968 booklet entitled "The General Motors Insurance Program for Salaried Employees" and its successor version issued in 1971 both contain provisions which state:

> If you retire ... and are eligible to receive retirement benefits under the provisions of the GM Retirement Program for Salaried Employees, you may keep your basic hospital, surgical and medical expense coverages in effect.... GM will pay the full monthly premium or subscription charge for such coverage.

A 1974 booklet entitled "Highlights of Your GM Benefits" contains a heading entitled "After Retirement, Your Insurance Coverages Can Be Continued As Follows" and states:

> Hospital–Medical Coverages: Your basic coverages will be provided at Corporation expense for your lifetime (except for voluntary retirement between ages 55 and 60 when combined years of age and credited service total less than 85). Dental coverages cannot be continued.

A 1977 booklet entitled "Your Benefits In Retirement" contains a section entitled "Your Health Care Benefits," and includes this question and answer:

> Are My Health Care Coverages Continued While I Am Retired?
>
> Your basic health care coverages will be provided at GM's expense for your lifetime....

That same booklet also contains a section that reads:

> Who Pays for My Benefits?
>
> General Motors pays the full cost of any basic health care coverages that are continued for most retired employees and for eligible surviving spouses and children of deceased retirees.

Similar or identical statements are contained in numerous other booklets distrib-

**2.** When GM became self-insured in 1985, CMEIP became CMEP.

uted by GM or its insurance carriers through the years.

However, these booklets also contain statements warning participants that their benefits are subject to change. Except for the booklet issued between 1974 and 1977,[3] each booklet contains a provision similar to one of the following:

General Motors believes wholeheartedly in this Insurance Program for GM men and women, and expects to continue the Program indefinitely. However, GM reserves the right to modify, revoke, suspend, terminate, or change the Program, in whole or in part, at any time....

GM health care coverages have been changed from time to time through the years and are subject to change in the future.

The Corporation reserves the right to amend, modify, suspend, or terminate its benefit Programs by action of its Board of Directors.

GM reserves the right to amend, change or terminate the programs described in this booklet.

In addition to the booklets described above, GM distributed various documents to the 40,000 members of the putative plaintiff class who took early retirement.

Beginning in 1974, GM instituted a program of Special Early Retirement with enhanced benefits for pension eligibles as an inducement for their departure in connection with plant closing, workforce downsizing, or other action initiated by GM. Over the years GM also offered other types of early retirement packages.

Many early retirees signed a "statement of acceptance," evidencing their agreement to accept GM's offer of early retirement. In some of these statements the early retiree affirms that he/she has "reviewed the benefits applicable" to him/her and "accepts them." In exchange, the retiree promises to release GM from liability for certain causes of action potentially connected with the early departure, including claims of age discrimination. Prior to signing these forms, many early retirees were given benefit summaries describing the health care benefits which they would receive during retirement.

In 1987, GM announced modifications in its health care program, to become effective in 1988 for salaried employees, retirees and surviving spouses. Under the modified program, participants who opt for traditional fee-for-service coverage[4] are required to pay an annual $200 individual or $250 family deductible for basic coverage. After the annual deductible is met, participants are responsible for a 20% co-payment for most basic services, until the annual out-of-pocket expense equals a maximum of $500. Combined, the deductibles and co-payments require participants to pay an annual maximum of $750 in medical bills which were previously paid by GM.[5]

### III. *Analysis*

■ It is well established that "ERISA simply does not prohibit a company from eliminating previously offered benefits that are neither vested nor accrued." *Adams v. Avondale Industries, Inc.*, 905 F.2d 943, 948 (6th Cir.1990) (quoting *Phillips v. Amoco Oil Co.*, 799 F.2d 1464, 1471 (11th Cir.1986)). As explained by committees of both the House and Senate:

[The] term "accrued benefit" refers to pension or retirement benefits and is not intended to apply to certain ancillary benefits, such as medical insurance or life insurance, which are sometimes provided for employees in conjunction with a pen-

---

**3.** GM provides no explanation as to why the 1974–77 booklet omitted a modification clause.

**4.** Since 1985 GM has allowed participants to opt for coverage through local Health Maintenance Organizations or Preferred Provider Organizations. The co-payments and deductibles instituted in 1988 did not apply to these participants. It appears that approximately 85% of the putative plaintiff class opt for traditional fee-for-service coverage.

**5.** Several other changes were made in GM's health care program at the same time. For example, vision and hearing aid coverages were eliminated; subsequently they were made available subject to co-payments and deductibles. CMEP deductibles were increased, and GM increased the monthly contribution required of CMEP participants. GM also instituted several benefit increases.

sion plan, and are sometimes provided separately. To require the vesting of these ancillary benefits would seriously complicate the administration and increase the cost of plans whose primary function is to provide retirement income. *See Moore v. Metropolitan Life Ins. Co.*, 856 F.2d 488, 491 (2d Cir.1988). Congress rejected the automatic vesting of medical insurance plans because "medical insurance must take account of inflation, changes in medical practice and technology, and increases in the cost of treatment independent of inflation." *Id.* at 492. These unstable variables prevent accurate predictions of future needs and costs. *Id.*

■ Although medical insurance benefits do not vest automatically under ERISA, such benefits may vest by agreement between the parties. In *In re White Farm Equipment Co.*, 788 F.2d 1186 (6th Cir.1986), the court held that:

> [T]he parties may themselves set out by agreement or by private design, as set out in plan documents, whether retiree welfare benefits vest, or whether they may be terminated. In construing such agreements, courts may draw inferences or make presumptions as this court has done in construing collective bargaining agreements providing welfare benefit plans.

*Id.* at 1193. Thus, the central issue in this case is whether GM set out in the plan documents an agreement or "private design" to vest health care benefits upon retirement, or provided that such benefits are subject to change.

As the court in *White Farm* indicates, the starting point for determining plaintiffs' rights under GM's health care plan is the "plan documents" themselves. *See also Musto v. American General Corp.*, 861 F.2d 897, 900 (6th Cir.1988). ERISA requires that every employee benefit plan be established and maintained pursuant to a "written instrument." 29 U.S.C. § 1102(a)(1). A program under which an

employer provides medical insurance benefits constitutes such a plan, *see* 29 U.S.C. §§ 1002(1)(A) and (3), and the insurance policies themselves are the "written instruments" required by law. *Musto, id.* at 901. Courts have also looked at written summary plan descriptions (SPDs)[6], required by ERISA 29 U.S.C. §§ 1022(a)(1) and 1024(b)(1), as evidence of the terms and conditions of employee welfare plans. *Musto, id.* at 904–906 (court analyzed insurance policy, insurance certificates, and relevant SPDs); *see also White Farm*, 788 F.2d at 1193–94 (court relied on SPDs as "indirect evidence" of the plan's terms). Accordingly, in this case I have reviewed the underlying plan documents, summary booklets, and SPDs in order to determine the terms of GM's health care plan for salaried retirees.

■ The underlying plan documents available here include various contracts and certificates of insurance, and a program statement drafted by GM in 1985. In none of these documents do I find GM's agreement to provide participants with vested health care benefits, and in fact plaintiffs do not rely upon these documents as evidence of such agreement. Rather, plaintiffs point to statements contained in summary booklets distributed by GM or its insurance carriers over the years. As plaintiffs correctly point out, these booklets uniformly contained provisions similar to the following:

> Your basic health care coverages will be provided at GM's expense for your lifetime....

Plaintiffs argue that provisions such as these constitute GM's agreement to provide salaried retirees, and eligible surviving spouses, with free lifetime health care coverage, and GM's agreement not to change that policy post-retirement. I do not agree.

Plaintiffs simply ignore plan provisions wherein GM unambiguously reserved its right to change the plan. For example, the very same page of the 1980 booklet cited

---

**6.** By 1977 ERISA had made it mandatory for the administrator of a welfare plan such as GM's to furnish each participant with "summary" descriptions of the plan, "written in a manner calculated to be understood by the average plan participant...." 29 U.S.C. §§ 1022(a)(1) and 1024(b)(1).

by plaintiffs expressly warned retirees that:

> GM Health Care coverages have been changed from time to time through the years and are subject to change in the future.

Virtually all booklets contained similar provisions.[7] For example, the 1985 booklet stated that:

> General Motors Corporation reserves the right to amend, change or terminate the Plans and Programs described in this booklet.

These provisions effectively informed plaintiffs that GM's present policy was to pay the full cost of basic health care coverage during plaintiffs' retirement, but that GM reserved the right to change that policy. To show that GM violated the plan when it instituted the 1988 changes, plaintiffs would have to show that GM effectively promised never to change the plan during plaintiffs' retirement. I find no such promise in any of the plan documents. Rather, I find that GM unambiguously reserved the right to change the plan, and thus did not agree in the general plan documents to provide salaried retirees with vested health care benefits.

This reading of GM's health care plan is consistent with the holding of the United States Court of Appeals for the Sixth Circuit in *Musto*, 861 F.2d 897 (1988). In *Musto*, the company's booklets summarizing the group medical insurance plan for retired employees stated that "[t]he Company pays the entire cost of the Plan with respect to Retired Employees." *Id.* at 905. However, the booklets also stated that "[t]he Company does, as it always has, reserve the right to change the Plan and, if necessary, discontinue it." *Id.* The district court, finding these provisions to be in "irreconcilable conflict," held that:

> To read the plan as providing lifetime paid up medical insurance and, at the

same time, reserving the right to terminate the benefits at any time constitutes an illusory promise—an express unqualified grant of a right negated by an express unqualified reservation of the right to terminate the grant.

*See Musto v. American General Corp.,* 615 F.Supp. 1483, 1499 (D.C.Tenn.1985). The court of appeals rejected this analysis, stating that:

> To read this summary as saying that the plan can never be changed in such a way as to mandate retiree contributions for continued medical coverage is to read into the summary something its authors did not put there (a promise to provide lifetime "paid up" medical insurance), while reading out of the summary something that clearly was put there (an express reservation of the right to change the plan). Such a reading violates the basic principle that each provision of a contract should be interpreted as part of an integral whole, to the end that all of the provisions may be given effect if possible.

*Musto*, 861 F.2d at 906.

In this case, plaintiffs ask me to read into the plan an irrevocable agreement to provide lifetime health care coverage at GM's expense, and to read out of the plan the provisions wherein GM expressly reserved its right to change the plan. Such a reading is precluded by this circuit's holding in *Musto*, which teaches that "where the power to terminate such a welfare plan has been reserved, it may be exercised...." *Id.* at 907 (quoting *White Farm*, 788 F.2d at 1192 and 1193). *See also Moore*, 856 F.2d at 492, cited with approval in *Musto*, 861 F.2d at 908, n. 6 (upholding employer's right to exercise modification clause notwithstanding employer's promise to provide "lifetime benefits at no cost to employees").

---

7. The only summary booklet not containing a provision warning employees of GM's right to modify or amend its health care benefit plan was issued in 1974. The next booklet, issued in 1977, clearly contained such a provision. Given that GM employees were generally put on notice of GM's right to modify its health care plan, I do not place great weight on its apparent failure to reiterate such notice in one booklet. *See Moore,* 856 F.2d at 490 (holding that employer's failure to include modification clause in one summary booklet did not defeat such right).

Because GM's general plan documents[8] unambiguously set forth GM's right to modify health care coverages, I find that these documents do not establish GM's agreement or "private design" to vest any particular level of health care benefits upon retirement.

■ Nevertheless, I do not foreclose the possibility that GM bilaterally contracted to provide vested benefits to early retirees. I make this finding because it appears that some early retirement agreements contain GM's promise to furnish early retirees with a particular level of health care coverage in exchange for the early retiree's promise to, *inter alia,* release GM from liability for certain causes of action. These early retirement agreements may be enforceable under ERISA as independent bilateral contracts or as modifications of GM's health care benefit plan.

GM argues that ERISA preempts early retirees from stating such a claim, citing, *e.g., Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 44, 107 S.Ct. 1549, 1551, 95 L.Ed.2d 39, 45–46 (1987); *Blau v. Del Monte Corp.,* 748 F.2d 1348, 1356 (9th Cir.1984), *cert. denied,* 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985); *Lee v. Prudential Insurance Co. of America,* 673 F.Supp. 998, 1002 (N.D.Cal.1987). In contrast, plaintiffs contend that the early retirement agreements are enforceable bilateral contracts under ERISA, citing, *e.g., Firestone Tire and Rubber Company v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 955, 103 L.Ed.2d 80 (1989) ("ERISA was enacted 'to promote the interests of employees and their beneficiaries in employee benefit plans,' and 'to protect contractually defined benefits'").

None of the cited cases addresses a situation where, as here, an employer allegedly agrees, apart from its regular plan, to provide a discrete group of employees with vested health care benefits in exchange for defined consideration. In the absence of controlling authority to the contrary, I will allow the early retirees to state such a claim in the circumstances of this case. Accordingly, GM's motion to dismiss Count IV of the complaint is DENIED insofar as that motion pertains to early retirees.

I also find that there are genuine issues of material fact as to (1) which "early retirement agreements" constitute bilateral contracts; (2) the terms of those contracts; and (3) whether the 1988 changes constitute a breach of those contracts. These factual issues preclude summary judgment for or against the early retirees as a class.

Accordingly, GM's motion for partial summary judgment is GRANTED as to general retirees but DENIED as to early retirees. Plaintiffs' motion for partial summary judgment is DENIED.

Finally, I GRANT GM's motion to dismiss Count III of the complaint inasmuch as the United States Court of Appeals for the Sixth Circuit has clearly held that "a company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan," *see Adams v. Avondale Industries, Inc.,* 905 F.2d 943, 947 (6th Cir.1990) (quoting *Musto,* 861 F.2d at 911).

IT IS SO ORDERED.

■

---

8. Plaintiffs argue that because the modification/termination warnings occur only in the summary booklets, and not in the "underlying plan documents" (*i.e.,* the pre–1985 contracts and certificates of insurance with various insurance companies), they are ineffective. Plaintiffs cannot have it both ways. If they intend to rely on the summary booklets as a source of the alleged promise to provide vested lifetime health care benefits at no cost to retirees, then they must also live with the modification/termination provisions contained in those booklets.