**Robert D. SPRAGUE, et al., Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

No. 90–CV–70010.

United States District Court,
E.D. Michigan,
Southern Division.

July 18, 1994.

Raymond C. Fay, Christopher G. MacKaronis, Hillary L. Pettegrew, Bell, Boyd & Lloyd, Washington, DC, J. Douglas Peters, David R. Parker, Charfoos & Christensen, Detroit, MI, for plaintiffs.

Robert F. Walker, Ethan Lipsig, Elliot K. Gordon, Paul, Hastings, Janofsky & Walker, Santa Monica, CA, David M. Davis, Daniel G. Galant, Gen. Motors Corp., Detroit, MI, and Terence V. Page, Birmingham, MI, for defendant.

## OPINION AND ORDER

FEIKENS, District Judge.

Before me are several matters intended to bring long-awaited closure to this prolonged litigation. The first two matters concern Count V of the Complaint, plaintiffs' equitable or promissory estoppel claims. The named plaintiffs, purporting to represent a class of approximately 84,000 General Motors Corporation ("GM") salaried retirees and their surviving spouses, assert that GM

should be estopped from eliminating certain health care coverages and shifting health care costs. Mirroring past arguments, GM moves for partial summary judgment or to dismiss Count V, maintaining that it cannot be held liable because it expressly retained the right to modify health care coverage as it sees fit.

I held a bench trial on Counts II and IV of the Complaint for two subclasses of "early retirees." Because the evidence presented at that trial also pertains to the early retirees' Count V claims, and because the parties have agreed[1] that no further trial is required on the early retirees' Count V claim, I may proceed to judgment pursuant to the procedures set out in Fed.R.Civ.P. 52. For the reasons stated below, I find in favor of the class of early retirees on Count V; that is, I hold GM liable under the doctrines of equitable and promissory estoppel for reducing or eliminating certain health care coverage for GM early retirees in 1988. I also rule that the "general retirees" cannot prevail on their Count V claims. I accordingly grant defendant's summary judgment motion as it pertains to that group of plaintiffs.

The final matter before me is plaintiffs' motion for an injunction to prevent GM from imposing program-wide deductibles and co-payments or otherwise shifting health care benefits costs to the group of early retirees. In essence, plaintiffs ask that I order GM to comply with the terms of the contract found in *Sprague II*. Plaintiffs' motion for injunctive relief is granted in part. GM's motion to stay that injunction pending appeal is denied.

## I. Background

The history of this case is well documented elsewhere and need not be repeated in its entirety. *See, e.g., Sprague v. General Motors Corp.*, 768 F.Supp. 605, 607–09 (E.D.Mich.1991) (*"Sprague I"*) (addressing Counts II, III, and IV); *Sprague v. General Motors Corp.*, 843 F.Supp. 266, 269 (E.D.Mich.1994) (*"Sprague II"*) (addressing Counts II and IV). For present purposes, it suffices to note that plaintiff Robert D. Sprague, together with 113 other named plaintiffs, originally brought this action in August 1989 claiming to represent a class of approximately 84,000 GM salaried retirees and their surviving spouses (collectively, the "retirees"). The essence of their complaint is that GM had promised them lifetime health care benefits, at no cost to them, and that GM in 1988 improperly reduced or eliminated aspects of these benefits. They claimed in Counts I, II, III, VI, and VII, that these reductions in health care benefits violated various provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461. Count IV alleged that GM was liable under the federal common law of contracts and Count V alleged that GM was liable under the doctrines of promissory or equitable estoppel.

The original group of plaintiffs ultimately was split in two for the purposes of this litigation. The "general retirees" are former

---

1. The parties agreed that I had adequate evidence to decide this issue during a June 16, 1994 telephone conference:

 The Court: What further evidence would there be ... on promissory estoppel on behalf of the early retirees?
 ....
 Mr. Fay (plaintiffs' attorney): .... I believe there is ample record evidence on the existing trial record.
 The Court: I think so. I—I believe that there is. How do you feel about that, Mr. Walker (GM's attorney)? Would General Motors want to present any further evidence?
 Mr. Walker: Well, your Honor, I—I must admit I haven't consulted with them, but I—I believe that there is adequate evidence in front of the Court to resolve this.
 The Court: .... That's the way I think I want to proceed, and that is to decide this promissory estoppel issue based both as to the general

 retirees and as to the early retirees, and I think that the evidence that I have before me in this rather complete trial that we had will enable me to do that. Let me ask would you want a further hearing on this, or would you want to submit whatever you wanted to submit on papers and let me proceed to a decision?

 (Tr. at 7–8). The parties then agreed that no further hearing was necessary and that they would submit further briefs. (Tr. at 10–11).
 GM seemed to back away from that agreement in a subsequent brief, where it argued that a further hearing might be required to determine whether each early retiree relied to his or her detriment on information provided. My decision would be the same even if GM were allowed out ·of the agreement, however. As I note *infra*, I find that plaintiffs have adequately shown that the early retirees detrimentally relied on GM representations or promises.

GM employees who retired voluntarily pursuant to the terms of the "General Motors Retirement Program for Salaried Employes." Under this program, salaried employees were allowed to retire without GM's consent as early as age 55 if they had worked ten years with GM and earlier if they had worked for GM for thirty years or more. Former GM employees who were involuntarily retired at GM's insistence and former salaried employees who were eligible for retirement due to total and permanent disability also belong to the group of general retirees. Members of this group received actuarially reduced or delayed pension benefits upon retirement.

The "early retirees" consist of former GM salaried employees who accepted one of the numerous early retirement offers GM extended to many of its employees between 1974 and 1988. These retirements required the consent of both GM and the employee.

Many of the original Counts are now resolved. In 1990, both parties filed motions for summary judgment and GM moved to dismiss various Counts of the Complaint. I granted GM's motion to dismiss Counts II and IV as to the general retirees but denied that motion with respect to the early retirees. *Sprague I*, 768 F.Supp. at 612. I also dismissed Count III in its entirety. *Id.* In November 1991, I certified a class of all the salaried employees who took early retirement, or who agreed to take early retirement, prior to March 1, 1988, and their surviving spouses. This class consists of four subclasses: early retirees (1) who signed "long-form" statements of acceptance of early retirement; (2) those who signed "short-form" statements of acceptance; (3) those who signed "statements of intent to retire"; and (4) those who signed neither a statement of acceptance nor a statement of intent to retire. After a bench trial, I found for sub-

classes (1) and (2) of early retirees on Counts II and IV. *Sprague II*, 843 F.Supp. at 319.

After I issued *Sprague II* in February 1994, counsel for both parties met with me and entered into several stipulations. The first pertained to the task of calculating the damages for the prevailing plaintiffs. The parties agreed that this task is straightforward and uncontroversial or "ministerial" in nature and that final judgment therefore is appropriate.[2] *See Woosley v. Avco Corp.*, 944 F.2d 313, 317 (6th Cir.1991) (finding that final judgment is appropriate when the remaining task of calculating damages is "mechanical," "uncontroversial," or "ministerial"). The parties also entered into several stipulations relating to the remaining subclasses of early retirees and the remaining Counts of the Complaint. The parties stipulated that I would dismiss Count I. They also stipulated that subclass 4 early retirees who took the same forms of retirement as the members of subclasses 1 or 2 are to be included in subclasses 1 or 2. Finally, plaintiffs agreed to dismiss Counts VI and VII of the Complaint.

## II. Count V: Promissory and Equitable Estoppel

■ GM moves either for summary judgment or to dismiss Count V, plaintiffs' estoppel claims. Its first argument is that claims for promissory or equitable estoppel are not permitted under ERISA. I disagree.

It long has been established that GM's health care program is an "employee welfare benefit plan" as defined by ERISA. 29 U.S.C. § 1002(1), (3). It is also clear that ERISA's broad preemption provision means that plaintiffs' claims are governed exclusively by federal law. 29 U.S.C. § 1144; *see, e.g., Cromwell v. Equicor–Equitable HCA Corp.*, 944 F.2d 1272, 1276, 1276 (6th Cir. 1991), *cert. dismissed,* —— U.S. ——, 113 S.Ct. 2, 120 L.Ed.2d 931 (1992). As a result, I must decide whether estoppel is an appro-

---

**2.** To determine damages, GM agreed to provide to the plaintiff class (1) "written calculations of all monthly premiums billed to the members of the plaintiff class ·by [GM] since January 1, 1994," (2) "its records as to all deductibles and co-payments rendered to members of the plaintiff class since 1988," and (3) "its records as to its computer files of denied claims." Plaintiff class,

in turn, agreed to furnish to GM its records in support of all individual monetary claims as to health care benefits since 1988. The parties also agreed that mitigation and offset issues, if any, will be resolved· in connection with individual class member claims presentations. (April 7, 1994 Tr. at 6–7).

priate remedy under ERISA—including the common law of ERISA.

As an initial matter, I note that the U.S. Court of Appeals for the Sixth Circuit already has answered that question. That court consistently has recognized that estoppel is incorporated into the federal common law of contracts for purposes of ERISA. *See, e.g., Armistead v. Vernitron Corp.,* 944 F.2d 1287, 1299–1300 (6th Cir.1991) (adopting estoppel principles for ERISA cases involving welfare plans); *Tregoning v. American Community Mut. Ins. Co.,* 12 F.3d 79, 83–84 (6th Cir.1993) (rejecting plaintiffs' estoppel claim on the facts but recognizing that estoppel remains a viable theory under ERISA); *Gill v. Moco Thermal Indus., Inc.,* 981 F.2d 858, 860 (6th Cir.1992) (estoppel not allowed on the facts of that case); *Sutter v. BASF Corp.,* 964 F.2d 556, 563 (6th Cir.1992) (rejecting plaintiffs' promissory estoppel claim, but only because there was no evidence that the alleged misrepresentation was intentional). GM acknowledges that *Armistead* and its progeny recognize estoppel in ERISA cases but nevertheless maintains that these holdings conflict with the U.S. Supreme Court's holding in *Mertens v. Hewitt Assocs.,* — U.S. ——, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). In short, GM argues that after *Mertens, Armistead* no longer is good law.

Plan participants seeking relief under ERISA must identify one of "[t]he six carefully integrated civil enforcement provisions found in § 502(a) [29 U.S.C. § 1132(a) ]." *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 146, 105 S.Ct. 3085, 3092, 87 L.Ed.2d 96 (1985); *see also Mertens,* — U.S. at ——, 113 S.Ct. at 2067 (stating that Congress did not intend to authorize remedies not expressly authorized by statute). Section 502(a)(3), which among other things, permits ERISA plan participants, beneficiaries, or fiduciaries to obtain "appropriate equitable relief" to redress ERISA violations or violations of the terms of an ERISA plan, is a natural candidate on which to base estoppel claims. *See Tregoning,* 12 F.3d at 83. *Mertens* is important to my analysis because it addressed the scope of relief available under § 502(a).

In *Mertens,* the Court held that a plan participant could not bring a cause of action under § 502(a)(3) against a non-fiduciary of an ERISA plan for knowingly participating in a fiduciary's breach of fiduciary duty. The Court explained that the term "appropriate equitable relief" in § 502(a)(3) contemplates "categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution)." *Mertens,* — U.S. at ——, 113 S.Ct. at 2069. The plaintiffs' claim was for "compensatory damages"—a form of relief which simply did not meet the definition of "appropriate equitable relief."

GM maintains that *Mertens* bars plaintiffs' estoppel claims because, it argues, estoppel is a cause of action for compensatory damages (not "appropriate equitable relief") and accordingly is an unauthorized remedy which neither redresses statutory violations nor violations of the terms of the plan. I disagree. Estoppel is a form of "appropriate equitable relief" designed to redress both statutory violations and violations of the terms of the plan.

■ Boiled to its basics, the question here is whether the retirees had a vested right to lifetime health care benefits, at no cost to them, or whether GM had the right to change those benefits. Whether ERISA benefits vest to a large degree depends upon the intent of the parties to the plan. *See, e.g., Hansen v. White Motor Corp. (In re White Farm Equip. Co.),* 788 F.2d 1186, 1193 (6th Cir.1986) (*"White Farm"*). This is especially true in this case because a welfare plan is involved: the vesting of welfare plans, unlike the vesting of pension plans, *see* 29 U.S.C. § 1053, is not subject to a statutory minimum vesting requirement, but instead depends solely on the agreement reached between the parties. *Armistead,* 944 F.2d at 1297–1300; *see also White Farm,* 788 F.2d at 1192–93 (noting that "the statutory scheme of ERISA, though silent on the issue, counsels against the imposition ... of an absolute rule effectively requiring mandatory vesting at retirement of retiree welfare benefits"). Determining whether the welfare benefits of a particular plan were intended to vest accordingly has become a matter of federal common

law under ERISA. *Id.* at 1193–94; *Armistead*, 944 F.2d at 1297–98.

Thus, I cannot accept GM's claim that estoppel does not redress any statutory violation or any violation of the terms of the plan. ERISA gives the parties free rein to decide whether and under what conditions a particular welfare plan vests, *White Farm*, 788 F.2d at 1193, and requires courts to police those agreements, *Armistead*, 944 F.2d at 1298–1300. Policing those agreements naturally requires courts to inquire both into the content of the agreement and the conduct of the parties to the agreement. *Id.* at 1299. As a result, the U.S. Court of Appeals for the Sixth Circuit, following ERISA's command to develop a "federal common law of rights and obligations" in such situations, *see Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56, 107 S.Ct. 1549, 1557, 95 L.Ed.2d 39 (1987); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989); *Armistead*, 944 F.2d at 1297–98; *White Farm*, 788 F.2d at 1193–94, has borrowed from the common law of contracts to effectuate the terms of the parties' agreement and the equitable principles of estoppel to protect agreeing parties against inequitable conduct. *See Armistead*, 944 F.2d at 1299. The court of appeals has made clear that § 502(a)(3)(B) provides a statutory basis for estoppel claims. *Tregoning*, 12 F.3d at 83.

I am aware that at least one court, the U.S. Court of Appeals for the Ninth Circuit, has invoked language from *Mertens* to hold that § 502(a)(3) does not support a cause of action for estoppel. *Watkins v. Westinghouse Hanford Co.*, 12 F.3d 1517, 1527–28 (9th Cir.1993). GM argues that I should follow the reasoning in *Watkins* and rule that

estoppel no longer is a viable theory in this circuit.[3] That, I refuse to do.

I note first that I am bound by the U.S. Court of Appeals for the Sixth Circuit's decisions in *Armistead* and *Tregoning* and not by the decision of the U.S. Court of Appeals for the Ninth Circuit's decision in *Watkins*. *Tregoning* was decided after *Mertens:* had the court of appeals wished to reexamine the efficacy of ERISA common law estoppel claims, it certainly had the opportunity to do so. It did not.

Nor would my decision be any different had the court of appeals not addressed this issue after *Mertens.* Prior to *Watkins*, the U.S. Court of Appeals for the Ninth Circuit had adopted a particularly limited version of estoppel in ERISA cases. Estoppel only was available in the Ninth Circuit where " '(a) the provisions of the plan at issue are ambiguous such that reasonable persons could disagree as to their meaning or effect, and (b) representations are made to the employee involving an oral interpretation of the plan.' " *Greany v. Western Farm Bureau Life Ins. Co.*, 973 F.2d 812, 821 (9th Cir.1992) (quoting *Alday v. Container Corp.*, 906 F.2d 660, 666 (11th Cir.1990), *cert. denied*, 498 U.S. 1026, 111 S.Ct. 675, 112 L.Ed.2d 668 (1991)). Thus, courts applying Ninth Circuit law could not invoke estoppel to award the payment of benefits that would be inconsistent with the written plan.[4] *Watkins*, 12 F.3d at 1520. Given this legal backdrop, the court in *Watkins* reasoned that estoppel in the Ninth Circuit only could be justified under § 502(a)(1) as a way to determine, in the face of plan ambiguities, the rights and benefits of a participant or beneficiary "under the terms of the plan." [5] All non–§ 502(a)(1) "estoppel"

---

**3.** I note that *Watkins* did not—as GM seems to imply—hold that estoppel claims are no longer recognized under ERISA after *Mertens.* Instead, the court held only that estoppel claims are not permitted under § 502(a)(3); the court explicitly recognized that estoppel remains a viable theory under § 502(a)(1) in situations where the plan language is ambiguous. *Watkins*, 12 F.3d at 1528 (noting that estoppel did not apply in that case because terms of the plan were "unambiguous").

**4.** I find this to be a rather peculiar rule. If taken seriously, it would preclude plan participants

from recovering even if the company was guilty of blatant inequitable conduct, such as outright deception or even duress. The approach taken by the U.S. Court of Appeals for the Sixth Circuit, on the other hand, would allow participants to recover in such situations.

**5.** Section 502(a)(1) states in pertinent part:

A civil action may be brought—
(1) by a participant or beneficiary—

. . . . .

(B) to recover benefits due to him under the terms of the plan, to enforce his rights under

claims in the Ninth Circuit (such as claims brought under § 502(a)(3)) necessarily lost the flavor of traditional "categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution)." *Mertens,* —— U.S. at ——, 113 S.Ct. at 2069.

In short, that estoppel under Ninth Circuit precedent could not be used to prevent defendants from asserting written contractual rights meant that there was nothing left to estop. Any "estoppel" claim brought under § 502(a)(3)'s "appropriate equitable relief" clause accordingly only could be packaged as a non-statutory cause of action to recover compensatory damages. But, as the court in *Watkins* correctly observed, after *Mertens,* § 502(a)(3) does not permit a non-statutory cause of action for compensatory damages.

The legal backdrop in the Sixth Circuit is crucially different. There is no bright-line rule in this circuit precluding parties from invoking estoppel to obtain the payment of benefits that would be inconsistent with the written plan. *See, e.g., Sutter,* 964 F.2d at 563 (noting that the general rule that the written plan controls will yield if plaintiffs can show that the defendant intentionally misrepresented relevant facts). Here, as in *Armistead,* plaintiffs "are alleging that [GM] may not exercise its asserted right of unilateral termination because of misleading representations of [GM's] agents." *Armistead,* 944 F.2d at 1299. Alternatively, plaintiffs assert that they relied on GM's promises not to exercise its unilateral right to change the retirees' health care benefits. Plaintiffs' estoppel claims thus cannot be construed as non-statutory causes of action for compensatory damages: instead plaintiffs ask that GM be prevented from asserting contractual rights. Estoppel here accordingly is a form of "equitable relief" analogous to "injunction, mandamus, and restitution" permissible under § 502(a)(3), *Mertens,* —— U.S. at ——, 113 S.Ct. at 2069, and not, as the court in *Watkins* phrased it, a "form of . . . recovery of compensatory damages." *Watkins,* 12 F.3d at 1520. I accordingly find that promissory and equitable estoppel claims—adopted by the court of appeals to police vesting agreements—remains cognizable under the terms of the plan, or to clarify his rights to

§ 502(a)(3)(B), at least in a case like this involving a welfare plan.

## III. Estoppel and the General Retirees

■ GM's second argument is addressed to the facts. It maintains that it should prevail even if estoppel is a valid theory under ERISA, because plaintiffs cannot meet the requirements of an estoppel claim. The relevant underlying facts for the general retirees differ significantly from those pertaining to the early retirees. I accordingly treat this second argument for each group separately.

■ ERISA equitable estoppel "precludes a party from exercising contractual rights because of his own inequitable conduct toward the party asserting the estoppel." *Armistead,* 944 F.2d at 1299. To prevail on an equitable estoppel claim, plaintiffs must show:

1) conduct or language amounting to a representation of material fact;
2) awareness of the true facts by the party to be estopped;
3) an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended;
4) unawareness of the true facts by the party asserting the estoppel; and
5) detrimental and justifiable reliance by the party asserting estoppel on the representation.

*Armistead,* 944 F.2d at 1298.

■ Promissory estoppel, in turn, holds a promisor liable for a clear and unambiguous promise which it reasonably should have expected would "induce action or forbearance on the part of the promisee . . . and which does induce such action." Restatement (Second) of Contracts § 90(1); *see Elmore v. Cone Mills Corp.,* 23 F.3d 855, 868 (4th Cir. 1994) (en banc) (Murnaghan, J., concurring); *Aquilio v. Police Benevolent Ass'n of the N.Y. State Troopers, Inc.,* 857 F.Supp. 190, 198–199 (N.D.N.Y.1994). The U.S. Court of Appeals for the Sixth Circuit, while recogniz- future benefits under the terms of the plan. . . .

ing that promissory estoppel is cognizable under ERISA, has yet to set out the elements of a promissory estoppel claim.[6] Under the Restatement of Contracts, to prevail on a promissory estoppel claim, plaintiffs must show: (1) "a clear and unambiguous promise," (2) "a reasonable and foreseeable reliance by the party to whom the promise is made," (3) and "an injury sustained by the party asserting the estoppel by reason of his reliance." Restatement (Second) of Contracts § 90 (1981).

An obstacle to the general retirees' estoppel claims is their inability to show that the alleged promises or representations upon which they allegedly relied are "clear and unambiguous," or that the statements "amount[ ] to a representation of material fact." The alleged promises or representations—taken out of context from summary booklets distributed by GM or its insurance carriers over the years—contained language similar to: "Your basic health care coverages will be provided at GM's expense for your lifetime." See Sprague I, 768 F.Supp. at 610. This language, put back in its proper context, does not unambiguously grant a *vested* right to lifetime welfare benefits, however. As I detailed at great length in *Sprague I,* language elsewhere in the plan documents, summary booklets, and summary plan descriptions in fact reveals that the opposite is true: GM expressly reserved the right to change the plan. *Id.* at 608–11. These plan documents reveal that GM never unambiguously promised or represented that it would provide the general retirees with vested health care benefits. *Id.* at 610–11.

I also note that the general retirees have failed to show detrimental reliance or that GM intended that the general retirees act on any representation or promise. Unlike the early retirees, *see infra,* the general retirees did not sign statements of acceptance or statements of intent to retire early, nor did GM's alleged representations induce them to retire early. Plaintiffs maintain general retirees could have demonstrated their reliance in ways other than early retirement—for example, workers who retired at 65 might have worked longer to accumulate greater assets had they not been assured lifetime health care at GM's expense, or these retirees could have adopted some other method of financial planning. This is mere speculation. Staving off summary judgment requires more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 340 (6th Cir.1993) (citing *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).[7]

Furthermore, both promissory estoppel and equitable estoppel require that any reliance on the alleged promises or representations be reasonable or justifiable. The alleged promises or representations given to the general retirees were at best ambiguous. I accordingly find that any such reliance on these statements was inherently unreasonable and unjustified. The general retirees cannot make out an estoppel claim. *See Gordon v. Barnes Pumps, Inc.,* 999 F.2d 133, 137 (6th Cir.1993) (charging plan participants with knowledge of plan document language which expressly provided that the benefits could be altered at any time).

## IV. Estoppel and the Early Retirees

■ Strictly speaking, it is unnecessary for me to reach the estoppel claims of subclasses 1, 2, and 4 of the class of early retirees because these subclasses prevailed

---

**6.** In *Sutter v. BASF Corp.,* 964 F.2d 556 (6th Cir.1992), the court stated that promissory estoppel cannot lie for alleged misrepresentations without showing that defendant intentionally deceived the plaintiffs. *Id.* at 563. Although the court purported to apply a promissory estoppel theory, the reference to misrepresentations seems to indicate that it in fact applied an equitable estoppel theory. As one court noted, "[e]quitable estoppel depends on a misrepresentation of an existing fact, while promissory estoppel requires a promise concerning future intent."

*Triology Variety Stores, Ltd. v. City Products Corp.,* 523 F.Supp. 691, 697 n. 3 (S.D.N.Y.1981).

**7.** Plaintiffs maintain that they should be allowed further discovery to flesh out these claims. That request is denied. Further discovery would be fruitless, in part because GM did not unambiguously promise or represent that the general retirees would receive lifetime health care benefits at no cost to them. Even if some of the general retirees could show reliance, that reliance (as I note in the text) would be unreasonable.

at trial on Counts II and IV.[8] I only address the issue because the parties have requested me to do so. My ruling here provides an alternative basis for relief to the bilateral contract theory found in *Sprague II*.[9]

In *Sprague II*, I found that GM entered into an extra-plan, bilateral contract or "special deal" with subclasses 1 and 2 of the class of early retirees under which GM promised these early retirees and their surviving spouses health care benefits for life at no cost to them in exchange for the retirees' promise to give up future employment with GM, the opportunity to earn a future salary, benefits and pension accruals, and various state law claims. *Sprague II*, 843 F.Supp. at 301, 308, 319. Much of the findings in *Sprague II* also support the early retirees' estoppel claims. As I noted in the introduction to this opinion, the parties have agreed that no further evidence need be presented on this issue. That is, I am not bound by the requirements of Fed.R.Civ.P. 56, but am free to make findings of fact and conclusions of law pursuant to the procedures set out in Fed.R.Civ.P. 52. I accordingly incorporate the findings of fact that I made in *Sprague II* for the purposes of this opinion.

■ GM has argued that ERISA precludes plaintiffs from invoking oral statements made to class members to establish the required promise or representation necessary to their estoppel claim. That is, GM maintains that plaintiffs may only use written promises or representations to establish their estoppel claims. I do not agree.

I acknowledge that there is no requirement that the common law of ERISA adopt the doctrines of promissory and equitable estoppel in their purest Restatement forms. Instead, courts have made clear that the application of estoppel must comport with other ERISA requirements to effectuate the statute's larger goals. *See, e.g., Armistead*, 944 F.2d at 1300 (discussing problems involved with applying estoppel principles when pensions plans are involved); *cf. Textile Workers Union v. Lincoln Mills of Alabama*, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957) (noting that the federal common law developed to govern collective-bargaining agreements must comport with the policies of the underlying federal statute). For example, courts have ruled that parties may not bring an estoppel action based on oral representations regarding pension benefits because this effectively would amount to an oral modification of the plan in violation of the writing and amendment requirements of 29 U.S.C. §§ 1102(a), (b)(3). *See Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir.1986).

I nevertheless conclude, as I did in *Sprague II*, that plaintiffs may rely on oral as well as written assurances to establish their claims. As the court in *Armistead* noted, accepting oral modifications is troublesome when a pension plan (as opposed to a welfare plan) is involved because contributions and pay-outs in pension plans are determined by actuarial assumptions reflected in the terms of the plan. *Armistead*, 944 F.2d at 1299–300. As a result, "the rights of other plan participants would be jeopardized by unrecorded oral agreements between plan officers and favored plan participants." *Id.* at 1299. *Armistead* also made clear, however, that an estoppel claim based only on oral assurances could be maintained in a welfare plan case, at least if the welfare plan gave the company the right to modify the plan's provisions and the plaintiffs took detrimental action as a result of the company's oral assurances. *Id.* at 1300; *see also Gordon*, 999 F.2d at 137 (recognizing that although "a basic principle of ERISA [is] that terms of a plan may not be modified or superseded by oral statements or other extrinsic evidence," estoppel based on oral assurances remains a viable theory in situations like *Armistead*); *Sutter*, 964 F.2d at 563 (recognizing that the written plan must yield if the company's oral misrepresentations were made in bad faith).

---

8. As noted, the parties have stipulated that subclass 4 retirees who took the same forms of retirement as members of subclasses 1 or 2 are considered members of subclasses 1 and 2 and accordingly fall into the ambit of my decision in *Sprague II*.

9. I also note that the parties have not asked me to decide subclass 3's Count II and IV claims. These claims technically remain undecided after this opinion. That is of no import, however, because subclass 3 prevails on its Count V claim.

My analysis accordingly relies both on GM's oral and written statements that the early retirees would receive lifetime health care benefits at no cost to them.

The first factor required to establish promissory estoppel (a clear and unambiguous promise) and the first factor required to establish equitable estoppel (conduct or language amounting to a representation of material fact) are easily met. As I found in *Sprague II*, the early retirees were told both orally and in writing that their early retirement would be accompanied by the health care benefits existing at the time of their retirement and that these benefits would continue, at no cost to the retirees, for their lives and for the lives of their surviving spouses. *Sprague II*, 843 F.Supp. at 308, 319.

I also find that the second through fourth equitable estoppel elements are met. GM was aware of the "true" facts in this case. That is, GM was aware of its own belief that it was free to unilaterally amend health care benefits; notwithstanding that belief, GM induced the early retirees to retire by telling them that they would receive the benefits for life at no cost to them. *Cf. Armistead*, 944 F.2d at 1299 (stating that the "true" fact there was the company's belief that it could terminate retirement insurance despite its assurances to the contrary). The early retirees, on the other hand, were unaware of this fact; GM repeatedly stressed that the retirees would be getting lifetime health care to no cost to them and did not stress the possibility that GM might change this benefit at a future date. *See, e.g., Sprague II*, 843 F.Supp. at 308 (discussing the Morris Memorandum). The evidence at trial showed that GM intended that the early retirees act on these representations by retiring early: the representations were intended to inform and encourage early retirement so that GM could reduce its work force. *See Sprague II*, 843 F.Supp. at 303, 308.

The final two equitable estoppel elements and the final promissory estoppel element are also met. These elements require that the retirees rely on the promise or representation and that such reliance be both reasonable or justifiable and the cause of an injury or some other detriment. Although objective manifestations of intent are alone sufficient to create a binding contract, *see, e.g., Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 873 (9th Cir.) ("Under the modern theory of contracts we look to objective, not subjective, criteria in ascertaining the intent of the parties."), *cert. denied*, 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979), to prevail on an estoppel theory, on the other hand, plaintiffs must show that they subjectively relied upon the promise or representation, 31 C.J.S. *Estoppel* § 71 (1964).

In *Sprague II*, I found that the signing of statements of acceptance of early retirement, coupled with actual early retirement (which included giving up the opportunity to earn a future salary, benefits and pension accruals), and the surrender of various state law claims, evidenced a binding bilateral contract between GM and its early retirees. At the bench trial in *Sprague II*, it became clear that lifetime health care benefits at no cost was a significant part of GM's early retirement offer. *See, e.g., id.* at 306–08. These facts convinced me that it is more likely so than not so that the early retirees were subjectively induced by the retirement offers (an important aspect of which was GM's promise to provide lifetime health care benefits at no cost) to sign statements of acceptance and to give up their lucrative jobs at GM and accept early retirement.

I also find that this reliance was reasonable and justifiable. GM led the early retirees to reasonably believe that they were receiving a special deal: notwithstanding language in the plan documents to the contrary, the early retirees would receive lifetime health care benefits at no cost to them. I repeat my finding from *Sprague II*, that "in the context of [these] special early retirement offers, class members could, and did, justifiably rely on information supplied to them, in both written and oral form, at the time of their retirements." *Id.* at 306.

The same result follows for subclass 3 early retirees, the group of early retirees who signed statements of intent to retire. The only difference between this subclass and subclasses 1 and 2 is that members of subclasses 1 and 2 signed statements of acceptance and members of subclass 3 only

signed statements of intent to retire. This difference is not significant. Members of subclass 3, like the other early retirees, were promised health care benefits for their lives and for their spouses' lives at no cost to them in exchange for their promise to give up future employment with GM, the opportunity to earn a future salary, benefits and pension accruals, and various state law claims. In both situations, plaintiffs were effectively induced to retire early because of GM's promises or representations.

I accordingly find, based on the facts presented at the trial of Counts II and IV, that the early retirees should prevail on their promissory and equitable estoppel claims.

## V. Plaintiffs' Motion for an Injunction

■■ The final matter before me is plaintiffs' motion for injunctive relief. They complain that GM continues to impose program-wide deductibles and copayments and to otherwise shift health care benefits costs to the early retirees despite the order I issued in *Sprague II.* They accordingly ask that I issue an injunction requiring GM to immediately comply with that order.

Section 502(a)(3) of ERISA gives district courts the authority to grant appropriate injunctive relief. *See Laborers Fringe Benefit Funds—Detroit and Vicinity v. Northwest Concrete & Constr., Inc.,* 640 F.2d 1350, 1352 (6th Cir.1981). The prerequisites for an injunction are: (1) plaintiffs are threatened by some irreparable injury for which they have no adequate remedy at law, (2) that real, not fancied, irreparable injury is threatened, and (3) that the issuance of the injunction does not offend public policy. *Id.* at 1353.

Here, plaintiffs claim that some form of injunctive relief is warranted by the threat of future GM non-compliance with the terms of the bilateral contract found in *Sprague II.* I agree.

Numerous cases have held that the injuries resulting from the denial of health care benefits are irreparable and justify the grant of injunctions. *See, e.g., International Resources, Inc. v. New York Life Ins. Co.,* 950 F.2d 294 (6th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 2941, 119 L.Ed.2d 565 (1992); *United Steelworkers v. Textron, Inc.,* 836 F.2d 6, 8 (1st Cir.1987); *United Steelworkers v. Fort Pitt Steel Casting,* 598 F.2d 1273, 1280 (3d Cir.1979); *Golden v. Kelsey–Hayes Co.,* 845 F.Supp. 410 (E.D.Mich.1994); *Schalk v. Teledyne, Inc.,* 751 F.Supp. 1261, 1264, 1267–69 (W.D.Mich.1990). In *International Resources,* for example, the U.S. Court of Appeals for the Sixth Circuit upheld a district court's finding that the denial of plaintiff's health care benefits amounted to irreparable harm because it made the retention of qualified caretakers difficult, which would adversely affect the plaintiff's health and potentially lead to irreversible physical harm. *International Resources,* 950 F.2d at 302. A contract to provide health care simply is unlike other contracts: retirees who are currently being deprived of health care which they cannot afford can never be adequately compensated by a future damages proceeding. *See, e.g., Schalk,* 751 F.Supp. at 1264, 1267–69 (finding irreparable harm in patients being forced to forego medical treatment because of deductible and copayments, and in the financial planning burden resulting from the uncertainty of future medical costs). I accordingly find that plaintiffs have met the first branch of the *Laborers* test.

I also find that the second branch of the *Laborers* test is met. One of the policies behind ERISA is to protect contractually defined benefits. *Firestone Tire,* 489 U.S. at 113, 109 S.Ct. at 955; *Schalk,* 751 F.Supp. at 1268. Further, as the court in *Schalk* noted, "the public interest lies in protecting the legitimate expectations of retirees that their health insurance will be provided for the rest of their lives" and "in the preservation of a healthy population." *Id.*

My conclusion that some sort of injunctive relief is required does not dictate that I grant plaintiffs' request for a broad injunction requiring GM to comply with the precise terms of the contract found in *Sprague II,* however. Such a broad form of injunctive relief would be inconsistent with the requirement that I grant an injunction only in cases where the denial of health care benefits will lead to irreparable harm. It also would pose an unnecessary hardship on GM. Instead, the injunction I issue is designed to afford interim relief to those members of the class

of early retirees who otherwise would be deprived of health care or dissuaded from purchasing coverage. The injunction only is in effect as an interim solution pending appeal of this case. I hereby order that:

First, GM shall make no further adverse changes to the health care benefits of the prevailing class members during the pendency of the appeal of this case;

Second, GM shall not require prevailing class members to pay monthly contributions or premiums for their basic health care benefits for all health care options;

Third, the total out-of-pocket amounts that prevailing class members are required to pay shall be limited to $1500 per year.

Defendant argues that an injunction is premature. I disagree. Since my order in *Sprague II*, GM has continued to make adverse health care changes affecting members of the class of early retirees. GM further was unwilling to stipulate to the interim provisions described above. This interim injunction is the only way to prevent further cost shifting, and to protect members of the prevailing class who might otherwise would be deprived of health care or dissuaded from purchasing coverage.

### VI. Defendant's Motion to Stay the Injunction Pending Appeal

Finally, GM asks that I stay this injunction pending appeal. The injunction accompanying this opinion is specifically designed as an interim remedy to assist prevailing plaintiffs while this case is on appeal. GM's motion is denied accordingly.

### VII. Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED that defendant's motion to dismiss Count V of the Complaint IS DENIED; that defendant's motion for summary judgment on Count V of the Complaint is GRANTED IN PART and DENIED IN PART; that the class of early retirees has prevailed on Count V of the Complaint; that the plaintiffs' motion for injunctive relief is GRANTED IN PART and DENIED IN PART.

A form of judgment may be presented by plaintiff class. That judgment shall incorporate the parties' April 7, 1994 stipulation regarding the manner in which financial relief to plaintiff class will be calculated upon resolution of appeal.