Robert D. SPRAGUE, et al., Plaintiffs–
Appellees, Cross–Appellants,

v.

GENERAL MOTORS CORPORATION,
Defendant–Appellant, Cross–
Appellee.

Nos. 94–1896 to 94–1898 and 94–1937.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 3, 1996.

Decided Aug. 14, 1996.

1426

Christopher G. Mackaronis (briefed), Raymond C. Fay (argued and briefed), Hillary L.

Pettegrew (briefed), Bell, Boyd & Lloyd, Washington, DC, J. Douglas Peters, Charfoos & Christensen, Detroit, MI, for Robert D. Sprague in Nos. 94–1896 to 94–1898.

Christopher G. Mackaronis (briefed), Raymond C. Fay (argued and briefed), Hillary L. Pettegrew (briefed), Bell, Boyd & Lloyd, Washington, DC, for Robert D. Sprague in No. 94–1937.

Stephen M. Shapiro (argued & briefed), Mayer, Brown & Platt, Chicago, IL, Kenneth S. Geller, Mayer, Brown & Platt, Washington, DC, Robert F. Walker, Elliot K. Gordon, Paul, Hastings Janofsky & Walker, Santa Monica, CA, for General Motors Corp.

Susan M. Green, Karen L. Handorf (argued), U.S. Dept. of Labor, Office of the Solicitor, Plan Benefits Sec. Div., Washington, DC, Nancy E. Monarch (briefed), U.S. Dept. of Labor, Office of the Solicitor, Washington, DC, for Secretary of Labor.

Mary Ellen Signorille (briefed), American Ass'n of Retired Persons, Washington, DC, for American Ass'n of Retired Persons in No. 94–1896.

David M. Heilbron (briefed), Leslie Landau (briefed), Page B. Barnes, McCutchen, Doyle, Brown & Enersen, San Francisco, CA, for Chamber of Commerce of the U.S., Michigan Manufacturers Ass'n, ERISA Industry Committee.

Before LIVELY, MARTIN and DAUGHTREY, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

A putative plaintiff class of more than 84,000 non-union retirees [1] of the General Motors Corporation filed suit under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.,* seeking a judgment requiring General Motors to furnish them with basic health care coverage at no cost for their lifetimes and the lifetimes of their surviving spouses. In their complaint, the plaintiffs alleged that General Motors violated the terms of its health care plan and the Employee Retirement Income Security Act by reducing or eliminating certain health care coverages beginning in 1988. The plaintiffs also claimed that the changes constituted a breach of General Motors' fiduciary duties under the Employee Retirement Income Security Act. The plaintiffs asserted separate causes of action arising from the same changes based on breach of contract and equitable or promissory estoppel. In addition, the plaintiffs alleged that General Motors violated the requirements of the Employee Retirement Income Security Act by failing to maintain its health care plan pursuant to a written instrument; refusing or failing to supply requested information; and failing to comply with requirements for summary plan descriptions.

In a series of opinions and orders, the district court: (1) held that General Motors unambiguously reserved to itself the right to modify health care coverages, and thus did not agree in the general plan documents to provide salaried retirees with vested health care benefits; (2) dismissed plaintiffs' claim that the 1988 changes constituted a breach of General Motors' fiduciary duties under the Employee Retirement Income Security Act; (3) certified a class of early retirees; (4) held that the class of early retirees was not entitled to a jury trial; (5) held that General Motors bilaterally contracted to provide vested health care benefits to the early retirees; (6) held that General Motors was estopped from modifying health benefits as to the early retirees but not as to the general retirees; and (7) granted limited injunctive relief prohibiting General Motors from implementing some of the contested modifications during the pendency of this appeal.

Final judgment in the case was rendered on August 4, 1994, and the parties filed timely notices of appeal. For the reasons set forth below, we **AFFIRM** the district court's rulings in part, **REVERSE** the district

---

1. The putative class included approximately 34,000 general retirees and approximately 50,000 early retirees. General retirees are individuals who were entitled to retire without General Motors' consent either at age sixty-five or after thirty years' service with the company. Early retirees are individuals who participated in one of the early retirement programs offered by General Motors between 1974 and 1988 which required that both the company and the employee consent to the retirement.

court's rulings in part, and **REMAND** for further proceedings consistent with this opinion.

### I.

The background of this case is complex, and has been set forth in *Sprague v. General Motors Corp.*, 768 F.Supp. 605 (E.D.Mich. 1991) (*Sprague I*), *Sprague v. General Motors Corp.*, 804 F.Supp. 931 (E.D.Mich.1992) (*Sprague II*), *Sprague v. General Motors Corp.*, 823 F.Supp. 442 (E.D.Mich.1993) (*Sprague III*), *Sprague v. General Motors Corp.*, 843 F.Supp. 266 (E.D.Mich.1994) (*Sprague IV*), and *Sprague v. General Motors Corp.*, 857 F.Supp. 1182 (E.D.Mich.1994) (*Sprague V*). We repeat the district court's recitation of those facts necessary to an understanding of this appeal.

In 1964, General Motors began to pay the full cost of basic hospital, medical, and surgical insurance for salaried retirees. This benefit was extended to most surviving spouses in 1968. General Motors also offered salaried retirees and surviving spouses an additional layer of coverage under its Comprehensive Medical Expense Insurance Program.[2] General Motors provided these coverages through arrangements with various private insurance companies. Some of the arrangements were memorialized in written contracts of insurance between the insurance carrier and General Motors, while others were not. All carriers provided participants with certificates of insurance detailing the terms of coverage.[3]

In 1985, General Motors became self-insured and the use of insurance certificates was discontinued. Instead, General Motors drafted a document entitled "The General Motors Health Care Insurance Program for Salaried Employees." This document, together with subsequent writings announcing coverage changes, described General Motors' health care coverage plan post–1985.

Over the years, General Motors communicated its health care coverage plan to employees and retirees by means of summary booklets. Prior to 1974, General Motors periodically published a booklet entitled "The GM Insurance Program For Salaried Employees." With the enactment of the Employee Retirement Income Security Act in 1974, the method of supplying participants with plan summaries changed. Thereafter, General Motors published a plan summary entitled "Highlights of Your GM Benefits." In addition, when the Employee Retirement Income Security Act began requiring summary plan descriptions in 1977, General Motors began to publish a booklet entitled "Your Benefits in Retirement." This booklet apparently served as and continues to serve as the summary plan description for benefits provided to salaried employees.

Several summary booklets distributed to General Motors' salaried employees and retirees contained statements informing participants that General Motors would pay the full cost of basic health care coverage during their retirement.[4] Most booklets also con-

---

**2.** When General Motors became self-insured in 1985, this program became the Comprehensive Medical Expense Program. At all times, participants were required to pay co-payments, deductibles, and a portion of the insurance premiums.

**3.** Until 1985, General Motors' formal plan was set forth in insurance policies and certificates of insurance issued by the Metropolitan Life Insurance Company and Blue Cross and Blue Shield. Those documents made statements to the effect that benefits would automatically cease upon discontinuance of the policy, and that General Motors could discontinue the policy by failing to pay the premium or by giving written notice.

**4.** The 1968 and 1971 booklets both stated: "If you retire ... and are eligible to receive retirement benefits under the provisions of the GM Retirement Program for Salaried Employees, you

may keep your basic hospital, surgical and medical expense coverages in effect.... GM will pay the full monthly premium or subscription charge for such coverage." A 1974 booklet stated: "Hospital–Medical Coverages: Your basic coverages will be provided at Corporation expense for your lifetime (except for voluntary retirement between ages 55 and 60 when combined years of age and credited service total less than 85). Dental coverages cannot be continued." The 1977 version of "Your Benefits in Retirement" stated: "Are My Health Care Coverages Continued While I Am Retired? Your basic health care coverages will be provided at GM's expense for your lifetime.... General Motors pays the full cost of any basic health care coverages that are continued for most retired employees and for eligible surviving spouses and children of deceased retirees." The district court found that similar or identical statements were contained in

tained statements, however, warning participants that their benefits were subject to change. With the exception of the 1966 and 1974 summary booklets, and the 1977 and 1980 versions of "Your GM Benefits," each summary contained a provision arguably reserving General Motors' right to modify or terminate its health insurance program.[5] In addition to these booklets, General Motors distributed various documents to individuals who retired early under various special early retirement programs offered by the company beginning in 1974.

In 1974, General Motors instituted a program of Special Early Retirement with enhanced benefits for pension-eligible employees as an inducement for their departure from the company. The company also offered other types of early retirement packages over the years. Many early retirees signed statements of acceptance evidencing their agreement to accept General Motors' offer of early retirement. In some of these statements, the early retirees affirmed that they had reviewed the applicable benefits and accepted them. In exchange, the retirees gave up their jobs and many promised to release General Motors from liability for certain causes of action potentially connected with their early departures. Prior to signing these forms, many early retirees were given benefit summaries describing the health care benefits they would receive during retirement.

In 1987, General Motors announced modifications in its health care program, to become effective in 1988 for salaried employees, retirees and surviving spouses. Under the modified program, participants who opt for traditional fee-for-service coverage are required to pay an annual $200 individual or $250 family deductible for basic coverage. After the annual deductible is met, participants are responsible for a 20% co-payment for most basic services, until the annual out-of-pocket expense equals a maximum of $500. Combined, the deductibles and co-payments require participants to pay an annual maximum of $750 in medical bills that were previously paid by General Motors. In addition, several other changes were made to General Motors' health care program at the same time. For example, vision and hearing aid coverages were eliminated and then later made available subject to co-payments and deductibles. In addition, Comprehensive Medical Expense Program deductibles were increased, and General Motors increased the monthly contribution required of Comprehensive Medical Expense Program participants. General Motors also instituted several benefit increases. These changes are the basis of the plaintiffs' suit.

## II.

Turning to the merits of this appeal, we first address the parties' claims that the district court erred in its class certification decisions. In *Sprague I*, the district court held that General Motors' plan documents unambiguously set forth the company's right to modify health care coverages, and did not vest in the employees the right to any particular level of health care benefits upon retirement. The court left open the possibility, however, that General Motors may have contracted bilaterally to provide vested benefits to early retirees, and subsequently certified the 50,000 early retirees as a class for a bench trial on that issue.[6] Having concluded

---

many other booklets distributed by General Motors or its insurance carriers over the years. *See Sprague I*, 768 F.Supp. at 608.

**5.** The booklets contained a provision similar to one of the following:

GM reserves the right to modify, revoke, suspend, terminate, or change the Program, in whole or in part, at any time.
GM health care coverages have been changed from time to time through the years and are subject to change in the future.
The Corporation reserves the right to amend, modify, suspend, or terminate its employee benefit plans or programs by action of its Board of Directors.
GM reserves the right to amend, change or terminate the plans and programs described in this booklet.

**6.** On November 4, 1991, the district court issued a class certification order establishing four subclasses of early retirees: (1) those who signed "long form" statements of acceptance; (2) those who signed "short form" statements of acceptance; (3) those who signed "statements of intent" to retire; and (4) those for whom no such documents could be found. *See Sprague II*, 804 F.Supp. at 933.

that the 34,000 general retirees had no claim to vested health care benefits, the district court never addressed their motion for class certification.

On appeal, the plaintiffs contend that the class should have included not only the early retirees, but the general retirees and their surviving spouses as well. The plaintiffs claim that: the general retirees are covered by the same class-wide allegations as the early retirees; all but one of the claims were raised on behalf of both general and early retirees; the conduct complained of is the same; and the relief sought is identical. Therefore, the plaintiffs claim that the general retirees, no less than the early retirees, satisfied the requirements of Fed.R.Civ.P. 23. General Motors, in turn, contests the district court's certification of the early retirees on the ground that Rule 23's commonality and typicality requirements were not met. General Motors claims that there was no single written or oral source of information common to all class members because there were tens of thousands of retirees who worked in dozens of different locations and retired over a fourteen-year period. Moreover, General Motors argues that the class members had different amounts of information, different sources of information, and different individual understandings about the meaning of those communications. Because the communications varied according to the time of an individual's retirement, his or her plant location, and the division involved, General Motors claims that the plaintiffs are not able to demonstrate commonality or typicality.

■ A district court's decision with regard to class certification is reviewed for an abuse of discretion. *Mayer v. Mylod*, 988 F.2d 635, 640 (6th Cir.1993). District courts have broad discretion over class certification controversies, but must "conduct a 'rigorous analysis' into whether the prerequisites of Rule 23 are met before certifying a class." *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1078–79 (6th Cir.1996). Under Fed.R.Civ.P. 23(a), four conditions must be met to file a class action suit: (1) the joinder of members must be impracticable; (2) questions of law or fact must be common to the

class; (3) the representatives of the class must be typical members of the class; and (4) the representatives must fairly represent the interests of the class. Under Rule 23(b), one of three conditions must be met to maintain a suit as a class action: (1) there must be a risk of either incompatible standards of conduct or a risk that interests of prospective class members would be impaired by an adjudication of others' claims; (2) the party opposing the class has acted toward the members in a uniform way; or (3) issues common to the class predominate over issues which are not common to the class and the best method of trying the suit is as a class action. *See Mayer*, 988 F.2d at 640.

■ A recent Fifth Circuit case expressly evaluated the propriety of class certification in the context of an Employee Retirement Income Security Act action. In *Forbush v. J.C. Penney Co.*, 994 F.2d 1101 (5th Cir. 1993), the court reversed a district court's refusal to certify a class where the potential class was covered by four different pension plans. The court stated that the commonality threshold for class certification is not high, and identified an issue common to the class: whether Penney's alleged overestimation of social security benefits violated the Employee Retirement Income Security Act's nonforfeiture provisions. *Id.* at 1106. The court stated:

> Framed in this manner, Forbush has met the commonality requirement, despite the fact that four different pension plans are involved. The interests and claims of the various plaintiffs need not be identical. Rather, the commonality test is met when there is "at least one issue whose resolution will affect all or a significant number of the putative class members." For this reason, "[t]he threshold of 'commonality' is not high." Although the subsequent determinations of individual awards are likely to be far less mechanical than Forbush suggests, the necessity for even somewhat complex individual calculations does not supply a basis for concluding that Forbush has not met the commonality requirement.

*Id.* (internal citations omitted).

While this Court recently stressed the importance of the commonality inquiry, we em-

phasized at the same time that the inquiry "is qualitative rather than quantitative, that is, there need be only a single issue common to all members of the class." *In re American Medical Sys., Inc.,* 75 F.3d at 1080 (citation omitted). Where there is such a common issue, we have routinely permitted class action suits in the Employee Retirement Income Security Act context. *See e.g., In re White Farm Equipment Co.,* 788 F.2d 1186 (6th Cir.1986) (involving claims by a group of retirees for recovery and reinstatement of allegedly nonterminable welfare benefits where the retirees were recipients of various descriptive brochures); *Boyer v. Douglas Components Corp.,* 986 F.2d 999 (6th Cir. 1993) (action by group of retired employees protesting attempted termination of health insurance benefits involving different plan booklets, handbooks, outlines, revised plan booklets, insurance certificates, and verbal assurances). In this case, the early retirees have several issues in common, including the predominant one of whether General Motors offered certain benefits to induce them to retire early. In addition to asserting the same rights asserted by the general retirees founded upon the basic plan, the early retirees contend that the early retirement offer and their acceptance of it formed a separate binding contract. We find that the early retirees satisfy the commonality requirement of Rule 23(a)(2).

▮ General Motors also attacks the district court's certification of the early retirees as a class on the ground that the plaintiffs' claims do not satisfy Rule 23(a)(3). The test for typicality is whether a "sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct." *In re American Medical Sys., Inc.,* 75 F.3d at 1082 (citations omitted). In *Forbush,* the Fifth Circuit noted that "[t]he test for typicality, like commonality, is not demanding." 994 F.2d at 1106. The court stated:

> It is true that much of the putative class is covered by plans other than the one applicable to Forbush, but Forbush has framed her challenge in terms of Penney's general practice of overestimating social security benefits. Her claim is therefore typical and thus provides no basis for suspecting that she will not adequately represent the interests of the class.

*Id.*

General Motors cites *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 597 (7th Cir.1993), in an effort to show that the different groups of retirees who received different representations should not be grouped together:

> Appellants have not provided any evidence other than speculation that any alleged communications by the City or the Funds to the fire, laborer, or municipal annuitants were the same as those made to the police. Even among the police, the record indicates that some annuitants heard these communications at retirement seminars, some read a booklet, some heard through word of mouth, and many simply had a general impression of the benefits to which they were allegedly entitled. Some were ignorant of any alleged promises.

*Id.* General Motors omits the immediately following portion of the opinion, however:

> Because the RCPA does not include individuals from all of the fund groups and there is no indication that each of these groups was treated identically by the City or by its respective fund, its claims cannot be deemed typical of the entire proposed class. The RCPA is composed only of retired police officers, and it simply cannot be assumed, especially because these communications were for the most part verbal, that the claims of these police officers "have the same essential characteristics as the claims of the class at large".... [T]he putative class has not demonstrated that the police annuitants' claims have the same essential characteristics as the claims of the class at large.... Moreover, the asserted estoppel claims depend on the particular nature of the communications allegedly made in a particular instance and on each annuitant's reliance on that particular communication.

*Id.* (internal citations omitted). The Seventh Circuit thus found typicality lacking because the police retirees were not representative of

retirees from other government branches and seemed not to fully represent the possible claims within even the police retiree group. By contrast, the class representatives in this case appear to embody the spectrum of information received by the class as a whole. This case is more analogous to *Forbush*, where the court concluded that, although much of the putative class was covered by plans other than the one applicable to the class representative, the representative framed her challenge in terms of the defendant's "general practice of overestimating social security benefits," thereby satisfying the typicality requirement of Rule 23(a)(3). *Forbush*, 994 F.2d at 1106. Although the early retirees in the class certified by the district court retired at various times and received different information, they attack a system-wide modification by General Motors of their right to benefits and therefore satisfy Rule 23(a)(3).

We hold that the district court did not abuse its discretion in granting class certification to the group of early retirees in this case. The district court will be required, however, to address the general retirees' request for class certification when the case is remanded for the reasons set forth below.

### III.

The parties' central arguments on appeal stem from the district court's grant of summary judgment against the general retirees on their claim for vested health care benefits, and its denial of summary judgment against the early retirees. In *Sprague I*, the district court found that General Motors' salaried health care plan contained an unambiguous reservation of the company's right to amend or terminate the plan, 768 F.Supp. at 610, and consequently granted summary judgment against the general retirees on their claim for vested health care benefits. The court denied summary judgment, however, as to the early retirees on this issue, and reserved the question of whether General Motors "bilaterally contracted to provide vested benefits to early retirees" for a later bench trial. 768 F.Supp. at 612. After the bench trial, the court ruled in *Sprague IV* in favor of the early retiree class, holding that the

company entered into contracts with its early retirees, assuring them and their surviving spouses that they would receive the same level of health care benefits for their lifetimes at no cost. 843 F.Supp. at 299. The court concluded that the early retirees had a vested right to lifetime health care benefits based on "statements of acceptance" that they signed and on various written and oral communications provided by General Motors. Although the court recognized that General Motors' benefits descriptions had varied, and that some of the descriptions reserved a right to amend the plan, it concluded that General Motors had promised to provide medical coverage to early retirees for life at no cost. *Id.* at 299, 317.

On appeal, the plaintiffs argue that the district court should have found that the general retirees also had vested rights to lifetime health care benefits. General Motors, by contrast, maintains that its plan documents unambiguously reserved General Motors' right to alter its health care plan, and contends that the district court erred in holding that the early retirees had a vested right to unchanged lifetime health benefits based on statements of acceptance signed by the early retirees and informal communications provided by General Motors.

 We review a district court's grant of summary judgment *de novo*. *Pope v. Central States Southeast & Southwest Areas Health and Welfare Fund*, 27 F.3d 211, 212–13 (6th Cir.1994). As to a district court's decision following a bench trial, we can only reverse the court's findings of fact if they are clearly erroneous. *Boyer*, 986 F.2d at 1003. However, contract interpretation is a question of law subject to *de novo* review. *Id.* A district court's dismissal of claims is also reviewed *de novo*. *In re DeLorean Motor Co.*, 991 F.2d 1236, 1239–40 (6th Cir.1993).

 The Employee Retirement Income Security Act "does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits. Employers or other plan sponsors are generally free under [the Act], for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss–Wright Corp. v.*

*Schoonejongen,* —— U.S. ——, ——, 115 S.Ct. 1223, 1228, 131 L.Ed.2d 94 (1995). The Act also does not establish "minimum participation, vesting, or funding requirements for welfare plans as it does for pension plans." *Id.* The absence of a statutory vesting requirement, however, does not mean that a welfare plan will never vest. *International Resources, Inc. v. New York Life Ins. Co.,* 950 F.2d 294, 301 (6th Cir.1991), *cert. denied,* 504 U.S. 973, 112 S.Ct. 2941, 119 L.Ed.2d 565 (1992). Although we have declined to construe the Employee Retirement Income Security Act as providing a mandatory point for the vesting of welfare benefits, "it is settled law that an employer and an employee may contract for post-employment welfare benefits." *In re White Farm Equip. Co.,* 788 F.2d at 1191.

▮▮▮ In determining whether the parties have contracted for such benefits, a court "must look to the intent of the parties and apply federal common law of contracts to determine whether welfare plan benefits have vested." *Gill v. Moco Thermal Indus., Inc.,* 981 F.2d 858, 860 (6th Cir.1992). Under the Employee Retirement Income Security Act, an employee benefit plan must be established and maintained pursuant to a "written instrument." 29 U.S.C. § 1102(a)(1). With regard to medical insurance benefits, insurance policies themselves are the "written instruments" required by law. *Musto v. American Gen. Corp.,* 861 F.2d 897, 901 (6th Cir.1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989). In ascertaining parties' contractual intent, a court therefore first looks to the "written instrument" which forms the agreement for clear manifestations of intent. *See Policy v. Powell Pressed Steel Co.,* 770 F.2d 609, 614 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986).

## 1. The General Retirees

▮▮▮ The plaintiffs in this case have never claimed that the underlying plan documents contained an agreement by General Motors to provide plan participants with vested health care benefits. Instead, they have argued that language included in summary plan descriptions and other summary documents distributed by General Motors or its insurance carriers over the years constituted an agreement by General Motors to provide salaried retirees and eligible surviving spouses with free health care coverage for life. The district court disagreed with the plaintiffs' contention, and found in *Sprague I* that, although the summary booklets "uniformly contained provisions similar to the following: 'Your basic health care coverages will be provided at GM's expense for your lifetime,' " 768 F.Supp. at 610, "[v]irtually all" of the booklets contained provisions unambiguously reserving General Motors' right to amend the plan. *Id.* at 610–11. The court concluded that only one summary booklet, issued in 1974, did not contain a provision reserving General Motors' right to change the plan, and held that, in light of the fact that "GM employees were generally put on notice of GM's right to modify its health care plan," its failure to reiterate such notice in one booklet was not entitled to great weight. *Id.* at 611, n. 7.

We conclude now that the district court's approach in *Sprague I* was mistaken in several respects. Most importantly, the district court disposed of the general retirees' claims without distinguishing among or thoroughly examining the different policies and summary booklets applicable to the various plaintiffs. The district court must distinguish clearly between informal summary communications and official summary plan descriptions before it can proceed to resolve any conflicting language in the plan documents or to ascertain the parties' intent in the event that plan language is found to be ambiguous.

In *Edwards v. State Farm Mut. Auto. Ins. Co.,* 851 F.2d 134 (6th Cir.1988), this Court held that, where a summary plan description exists and contains language which conflicts with statements in the underlying plan document, the summary plan description must govern. The Employee Retirement Income Security Act "requires, in no uncertain terms, that the summary plan description be 'accurate' and 'sufficiently comprehensive to reasonably apprise' plan participants of their rights and obligations under the plan." *Hansen v. Continental Ins. Co.,* 940 F.2d 971, 981 (5th Cir.1991); 29 U.S.C.

§ 1022(a)(1). Consequently, we reasoned in *Edwards* that "[i]t is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document and then proclaim that any inconsistencies will be governed by the plan. Unfairness will flow to the employee for reasonably relying on the summary booklet." 851 F.2d at 136 (citations omitted); *see also Aiken v. Policy Management Sys. Corp.*, 13 F.3d 138, 140 (4th Cir.1993) (holding that "representations in a SPD control over inconsistent provisions in an official plan document"); *Hansen*, 940 F.2d at 982 (stating that, like the Sixth and Eleventh Circuits, the Fifth Circuit holds that where there is a conflict between a summary plan description and the terms of a master policy, the summary plan description governs). In this case, the district court failed to recognize and take the *Edwards* principle into account in reaching its decision in *Sprague I*. We believe that the principle enunciated in *Edwards*, a pension plan case, applies equally to welfare plan cases, and therefore extend the *Edwards* rule to the welfare plan context.

Twelve summary booklets were issued between 1965 and 1988. Most, but not all, of the booklets contained a provision to the following effect: "Your basic health care coverages will be provided at GM's expense for your lifetime," and more than one summary booklet failed to contain an express reservation of right provision. Our review of the relevant provisions indicates that not only was such a provision absent in the 1974 version of "Your GM Benefits," but two additional booklets ("Your GM Benefits" published in October of 1977 and August of 1980) contained lifetime language without an express reservation of right.[7] Thus, three of the "Your GM Benefits" booklets distributed to employees between 1974 and 1988, as well as the 1966 "Your GM Benefits" booklet contained no reservation of right language. By contrast, three pre-Employee Retirement Income Security Act booklets (1965, 1968, and 1971) and the 1985 and 1988 summaries contained language to the effect that GM "reserves the right to amend, change or terminate the Plans and Programs described in this booklet."

The district court also failed to distinguish clearly between the effect of the "Your GM Benefits" booklets and the "Your Benefits in Retirement" booklets. Although the district court stated in *Sprague I* that the "Your Benefits in Retirement" booklets published in 1977 and 1980 qualified as summary plan descriptions, 768 F.Supp. at 608, it did not state definitively whether the "Your GM Benefits" booklets published in 1977 and 1980, or the other summary booklets for that matter, qualified as official summary plan descriptions. General Motors admits, however, that "the booklets issued since 1977 have qualified as summary plan descriptions," (Brief for General Motors at 3), and we will proceed on that assumption.

Just as importantly, the district court's factual findings are inconsistent with regard to when certain summary plan descriptions were distributed, and the parties disagree as to whether the "Your Benefits in Retirement" booklets were distributed to employees prior to or after their retirement. General Motors claims that the "Your Benefits in Retirement" booklets were "generally" and "routinely" distributed to active employees prior to their retirement. (Brief for General Motors at 4, 28). The plaintiffs, by contrast, contend that it was not a routine practice to distribute the booklets before retirement, and argue that, on the summary judgment record in *Sprague I*, it was undisputed that the "Your Benefits in Retirement" booklets were distributed to retirees rather than active employees. In *Sprague IV*, the district court concluded that the "Your GM Benefits" booklet was "designed for distribution to active employees" and was "not associated with any early retirement offer," and that many early retirees did not receive a copy of the "Your Benefits in Retirement" booklet "until after they retired, or just before they walked out the door." 843 F.Supp. at 303. It is vital that the district court clearly resolve the issue of whether the "Your Benefits in Retirement" booklet was generally distributed

---

7. The "Your Benefits in Retirement" booklets distributed in November of 1977 and August of 1980 did contain language stating that "GM health care coverages have been changed from time to time through the years and are subject to change in the future."

to employees before or after retirement so that it can in turn decide whether individuals retiring under the 1977 and 1980 summary plan descriptions are entitled to vested health care benefits (see discussion below).

The district court also failed to distinguish between the effect of official statutory summary plan descriptions and other general summary booklets distributed over the years. Although the Employee Retirement Income Security Act was passed in 1974, it did not require companies to provide summary plan descriptions until 1977.[8] Therefore, the 1974 "Your GM Benefits" booklet was actually a pre-Employee Retirement Income Security Act summary booklet. However, both the district court and the parties seem to have treated this summary booklet as having the status of an official summary plan description. *See* Brief for Sprague at 7, n. 11 (stating that, "[t]hough the 1974 booklet predated ERISA's SPD requirement, GM's declarant stated that GM prepared this booklet as if the SPD requirement were already in effect"); Amicus Brief for Secretary of Labor at 22 (stating that the 1974 summary "although issued prior to 1977 and not formally an SPD, apparently was distributed by GM to employees before they retired with the intention of summarizing the benefits offered under the plan in an easily comprehensible manner. GM acknowledged that this booklet served as the summary plan description mandated by ERISA for active employees, although the company was aware that it was not required to meet ERISA's formal requirements for SPDs until 1977." CR 78 at 18–19). On remand, the district court must determine whether the 1974 summary booklet meets the statutory criteria of a summary plan description and was intended to serve as such.

If the district court determines on remand that the 1974 booklet is to be treated as an official summary plan description, *Edwards* will apply to those individuals who retired while the 1974 "Highlights of Your GM Benefits" booklet was in effect because that book-

let would have been given the status of an official summary plan description, and contains lifetime language with no express reservation of right. Similarly, if the district court determines on remand that the 1977 and 1980 "Your GM Benefits" booklets were summary plan descriptions generally distributed to employees before retirement, while the 1977 and 1980 "Your Benefits in Retirement" were distributed to individuals who had already retired, individuals retiring while those summary plan descriptions were in effect would be entitled to vested health care benefits under *Edwards*. General Motors must provide coverage to those employees who retired while summary plan descriptions were in effect that promised lifetime benefits at the company's expense and did not include an effective reservation of right provision. Where this situation exists, the summary plan description is unambiguous and trumps any policy language to the contrary. Judgment would be entered in favor of those individuals retiring under the 1977 and 1980 "Your GM Benefits" booklets because they would not have received summary plan descriptions containing limiting language until after retirement, at which time their rights to vested health care benefits would already have been established. In other words, if employees retired while the 1977 or 1980 "Your GM Benefits" were in effect and did not receive the 1977 or 1980 summary booklets containing arguable reservation language (i.e. "changed from time to time") until after their retirement, they are entitled to vested benefits because the plan documents distributed to them while they were active employees included a summary plan description purporting to grant lifetime benefits with no effective reservation of right. *See Gentile v. Youngstown Steel Door Co.*, 1986 WL 17464 at *5 (6th Cir. Aug. 25, 1986) (stating that a court "must focus on the plan documents which were distributed to the retirees while they were active employees to determine the terms of their contract with the company"); *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368,

8. A summary plan description is a publication explaining the benefits of a particular welfare benefits plan. Pursuant to 29 U.S.C. § 1022 (1988), the Employee Retirement Income Security Act requires employers to distribute summary

plan descriptions to their employees. A summary must meet the criteria set out in 29 U.S.C. §§ 1022(a) and (b) to qualify as a summary plan description.

1378 (6th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 667, 130 L.Ed.2d 601 (1994) (stating that once an employee is entitled to a benefit, it would be "illusory" to divest the benefit retroactively). This principle holds true even where General Motors may have included language at the end of a summary plan description stating that the summary does not include all terms and conditions of the master policy and that all rights and benefits are governed by the master policy. *See Hansen,* 940 F.2d at 982 (stating that a company may not "avoid the binding effect of its statements in the summary plan description on the basis of language included at the tail end of the booklet" and that a necessary corollary to holding that statements in a summary plan description are binding is that drafters of a summary may not disclaim its binding nature).

■■■ The *Edwards* principle is inapplicable where an underlying plan document is specific and a summary plan description is silent on a particular matter. Although "clear and unambiguous *statements* in the summary plan description are binding, the same is not true of silence." *Jensen v. SIPCO, Inc.,* 38 F.3d 945, 952 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1428, 131 L.Ed.2d 310 (1995) (quoting *Wise v. El Paso Natural Gas Co.,* 986 F.2d 929, 938 (5th Cir.), *cert. denied,* 510 U.S. 870, 114 S.Ct. 196, 126 L.Ed.2d 154 (1993)). Where neither a summary nor an underlying policy contains a promise of lifetime benefits, individuals retiring while such documents were in effect are not entitled to vested benefits. By contrast, where a summary contains no promise of lifetime benefits, but the policy itself promises such benefits and contains no reservation of right, individuals retiring while such documents were in effect are entitled to vested health care benefits. These principles apply in the context of those employees who retired prior to the effective date of the Employee Retirement Income Security Act. Benefit summaries distributed to those individuals do not have the same effect as official summary plan descriptions and the terms of the underlying policy, if unambiguous, control.

■■■ Where a summary plan description contains both a reservation of right provision and a promise of lifetime benefits, the general rule in this Circuit is that the plan unambiguously retains the company's right to amend the plan and that provision must govern. *In re White Farm Equip. Co.,* 788 F.2d at 1193 (stating that where documentary evidence is unambiguous, it is not subject to interpretation to ascertain its meaning and intent). In *Musto,* we held that extrinsic evidence may not be considered where a welfare benefit plan unambiguously reserves the plan administrator's right to amend or terminate the plan.[9] 861 F.2d at 902; *see also Schachner v. Blue Cross & Blue Shield of Ohio,* 77 F.3d 889, 894 (6th Cir.1996) (stating that extrinsic evidence is admissible to aid in the interpretation of a contract only where an ambiguity is "patent" and "apparent on the face of the contract"); *Moore v. Metropolitan Life Ins. Co.,* 856 F.2d 488, 492 (2d Cir.1988) (stating that, even where a company describes benefits as being for an employee's "lifetime" and "at no cost," where

---

**9.** In *Musto,* the insurance policy stated that "[t]he company reserves the right to determine new premium contributions from time to time and at any time." 861 F.2d at 901–02. The court found this sentence to be unambiguous, and also found that nothing in the insurance certificates suggested that the company would be foreclosed forever from imposing new charges or increasing charges in the medical coverage provided to retired employees. *Id.* at 902. The court found that this unambiguous statement was not counteracted by a brief statement in annual personal benefits statements stating that "[y]ou are not required to contribute for these benefits after your retirement." *Id.* at 903. Instead, the court held that that statement was "perfectly accurate at the time," and did not say anything

"one way or the other about the possibility of future amendments regarding insurance benefits." *Id.* The court stated: "[t]o read this summary as saying that the plan can never be changed in such a way as to mandate retiree contributions for continued medical coverage is to read into the summary something its authors did not put there (a promise to provide lifetime "paid up" medical insurance), while reading out of the summary something that clearly was put there (an express reservation of the right to change the plan). Such a reading violates the basic principle that each provision of a contract should be interpreted as part of an integrated whole, to the end that all of the provisions may be given effect if possible." *Id.* at 906.

the company includes an unambiguous reservation of its right to change or discontinue medical expense plans, the plan's unambiguous reservation of right provision must govern).[10]

In the case before us, we hold that, with two exceptions, if the district court finds that a summary plan description contains both an express reservation of right provision and a promise of lifetime benefits, judgment should be granted for General Motors with regard to individuals retiring while such plans were in effect on the ground that the company reserved to itself the right to amend its plan at any time. The two exceptions we refer to are the 1977 and 1980 sets of summary plan descriptions. In the event that the district court determines that both the "Your GM Benefits" and "Your Benefits in Retirement" were distributed generally to employees *prior* to retirement, we believe the "changed from time to time" language in the "Your Benefits in Retirement" booklets should be viewed as giving rise to an ambiguity in the plan language rather than as an unambiguous reservation of General Motors' right to amend the plan. *See Wulf,* 26 F.3d at 1376 (stating that plan language is ambiguous "if it is subject to two reasonable interpretations"). We believe this is the best approach, and distinguish this case from *Musto* and *Boyer,* for two reasons. The first and more important reason is that, in 1977 and 1980, General Motors distributed two booklets within approximately two months' time which inherently contradicted each other. Both contained promises of lifetime benefits while one contained no reservation of right and the other contained arguable disclaimer language (i.e. "changed from time to time" language). Because these contradictory statements relating to the plaintiffs' health care coverage were contained in separate summary plan descriptions, if employees received both booklets prior to retirement, we do not believe the summary plan descriptions should be viewed as unambiguous. Although it may be determined on remand that the "changed from time to time" language did in fact reserve General Motors' right to amend the plan, an automatic deprivation of vested rights is not warranted because of the context in which General Motors distributed the inherently contradictory summary booklets within such a short span of time. The district court, therefore, should examine extrinsic evidence to determine whether plaintiffs who retired under those summary plan descriptions are entitled to vested benefits.

We also distinguish this case from *Musto* and similar cases based on the type of language at issue. In *Musto,* the purported promise of lifetime benefits at the company's expense was weaker (i.e. the company stated that coverage would "continue" for retirees), whereas in the 1977 and 1980 summary plan descriptions, General Motors made explicit promises of "lifetime" benefits. At the same time, there was a controlling document in *Musto* which specifically reserved to the company the right to discontinue coverage and the "right to determine new premium contributions from time to time and at any time." *Boyer* is distinguishable on the same grounds: the assurances in that case were weaker than the lifetime promises made by General Motors in this case, and the company included an explicit reservation of right in the summary plan description.

In the event the district court must resolve an ambiguity created by the 1977 and 1980 summary plan descriptions, it may, under federal common law, use traditional principles of contract interpretation to resolve the

---

10. The court in *Moore* declined to accept the plaintiffs' argument that, despite Metropolitan's clear reservation in the plan documents and summary plan descriptions of its right to amend or terminate plans, the contract between the company and employees consisted instead of the "totality of the representations made to the employees by the Company, and the actions of the employees in accepting those representations by remaining with the Company." 856 F.2d at 491–92. The court concluded that the "[p]laintiffs' argument, if accepted, would undermine ERISA's framework which ensures that plans be governed by written documents filed under ERISA's reporting requirements and that SPDs, drafted in understandable language, be the primary means of informing participants and beneficiaries." *Id.* at 492. The court concluded that, "absent a showing tantamount to proof of fraud, an ERISA welfare plan is not subject to amendment as a result of informal communications between an employer and plan beneficiaries." *Id.*

ambiguity, including drawing inferences and presumptions and introducing extrinsic evidence. *Boyer*, 986 F.2d at 1005; *In re White Farm*, 788 F.2d at 1193. In resolving plan ambiguities, "ERISA plans, like contracts, are to be construed as a whole." *Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90, 93 (3d Cir.1992) (stating also that, "[i]n interpreting an ambiguous ERISA plan, a court may consider the intent of the plan's sponsor, the reasonable understanding of the beneficiaries, and past practice, among other things").

■■■ Finally, the district court erred in granting summary judgment against the general retirees who retired after General Motors became fully self-insured in 1985. A genuine issue of material fact exists as to whether the 1985 "Draft Plan" constituted the governing plan document for the salaried retirees, and whether it contained the essential elements of the Employee Retirement Income Security Act's "written instrument" requirements. 29 U.S.C. §§ 1102(a) and (b). In addition, the district court made no findings as to whether or when the "Draft Plan" was amended, a finding essential to determining the rights of those individuals who retired during the self-insured period. On remand, the district court must determine whether the 1985 "Draft Plan" constituted a plan document, whether it was validly amended, and the effect of the 1985 and 1988 summary plan descriptions.[11]

## 2. The Early Retirees

In *Sprague IV*, the district court held that General Motors contracted away its right to alter health care benefits for early retirees through early retirement agreements and various other communications made to the early retirees by the company. The court concluded that both the long-form and short-form statements of acceptance of early retirement signed by the early retirees "evidence a binding bilateral contract between GM and its early retirees," 843 F.Supp. at 301, and are enforceable under the Employee Retirement Income Security Act as independent bilateral contracts or as modifications of General Motors' health care benefit plan. The court stated:

> The statements are framed in clear contract language of offer, acceptance and agreement. By signing them, the salaried retirees in subclasses (1) and (2) agreed to retire and accept the applicable benefits. In exchange they gave up future employment (and re-employment) with GM, the opportunity to earn future salary, benefits and pension accruals, and waived some of their legal rights to state claims against GM.

*Id.*

Having concluded that General Motors contracted with the early retirees, the district court sought to determine the terms of the contracts by looking to basic contract law. Because the district court found that the statements of acceptance were not completely integrated contracts,[12] it considered extrinsic evidence concerning the meaning of the contractual terms and the parties' intent. In doing so, the court noted that, although the interpretation of an employee benefit plan generally begins with the official "written instrument" and/or the summary plan description, "members of the plaintiff class were offered a special deal, the terms of which go beyond the general retirement plan." *Id.* The district court thus did not rely on the formal plan and summary plan descriptions, but rather based its decision on the information given to the early retirees as they decided whether to leave their jobs. The information included both the terms of the special early retirement agreements and other extrinsic evidence, including oral statements. *Id.*

The parties' arguments on appeal raise two questions with regard to the status of the

---

11. The 1985 editions of "Your GM Benefits" and "Your Benefits in Retirement" both contained promises of lifetime benefits and express reservations of right. The 1988 version of "Your GM Benefits" contained no lifetime language, but did contain an explicit reservation of General Motors' right to amend the plan.

12. The court found that the statements of acceptance did not contain all of the contract's terms because "[r]eference is made to the 'Special Early Retirement provisions of the General Motors Retirement Program' and the 'benefits applicable ... under the provisions of the Program.'" *Id.*

early retirees' health benefits. The first is whether employees can obtain vested rights to welfare plan benefits based on representations outside the official plan documents. The second is whether, if such agreements are enforceable, the district court in this case properly construed the terms of the contracts at issue.

■■■ We find on the facts of this case that General Motors entered into contractual agreements with its early retirees whereby the company vested certain health care benefits in the retirees and their spouses in exchange for the early retirees' acceptance of early retirement and, in some cases, their release of General Motors from any claims of unlawful termination. As the district court found, "early retirement was presented ... as a special package deal that included health care, separate and distinct from the regular GM retirement program." *Sprague IV,* 843 F.Supp. at 271. The district court made extensive and detailed factual findings with regard to the benefit summaries given and oral statements made to early retirees shortly before they decided to retire. We agree with the district court that the information on health care supplied to early retirees formed the basis of an agreement apart from the company's regular health care plan to provide early retirees with vested health care benefits in exchange for defined consideration, *Sprague IV,* 843 F.Supp. at 299, and affirm the district court's judgment in favor of the early retirees on this issue.

## IV.

The parties also contest the district court's rulings on their estoppel claims. In *Sprague V,* the district court dismissed the general retirees' claims to health benefits based on principles of estoppel based on its holding in *Sprague I* that General Motors unambiguously reserved the right to change those benefits. The court held that, unlike the early retirees who signed special statements of acceptance of early retirement in return for a promise of lifetime benefits, there were no "clear and unambiguous" promises or representations of lifetime benefits upon which the general retirees could have reasonably relied. *Sprague V,* 857 F.Supp. at 1189. At the same time, the district court ruled that General Motors was estopped from modifying health care benefits as to the early retirees based on statements of acceptance, summary plan descriptions, and certain benefit summaries distributed to early retirees at the time of early retirement. The court considered its ruling as to the early retirees to be an alternative basis for relief to the bilateral contract theory on which they prevailed in *Sprague IV.*

We have recognized that principles of estoppel may be applicable in the context of the alteration or termination of retiree health benefits provided pursuant to an employee welfare plan. *See Armistead v. Vernitron Corp.,* 944 F.2d 1287, 1299–1300 (6th Cir. 1991); *see also In re Unisys Corp.,* 58 F.3d 896, 907 (3d Cir.1995) (*Unisys I* ) (stating that "[a]n ERISA beneficiary may recover benefits under an equitable estoppel theory upon establishing a material misrepresentation, reasonable and detrimental reliance upon the representation, and extraordinary circumstances"). Therefore, the district court properly noted that "[e]stoppel is a form of 'appropriate equitable relief' designed to redress both statutory violations and violations of the terms of the plan." *Sprague V,* 857 F.Supp. at 1186.

As the district court stated, "ERISA equitable estoppel 'precludes a party from exercising contractual rights because of his own inequitable conduct toward the party asserting the estoppel.' " *Id.* at 1188, *Armistead,* 944 F.2d at 1299. We have set forth the elements of equitable estoppel in an action pursuant to the Employee Retirement Income Security Act as follows:

> (1) conduct or language amounting to a representation of material fact; (2) awareness of the true facts by the party to be estopped; (3) an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct be so intended; (4) unawareness of the true facts by the party asserting the estoppel; and (5) detrimental and justifiable reliance by the party asserting estoppel on the representation.

*Swinney v. General Motors Corp.,* 46 F.3d 512, 522–23 (6th Cir.1995) (citing *Armistead,* 944 F.2d at 1298).

As the district court indicated, promissory estoppel "holds a promisor liable for a clear and unambiguous promise which it reasonably should have expected would 'induce action or forbearance on the part of the promisee ... and which does induce such action.'" *Sprague V,* 857 F.Supp. at 1188 (quoting Restatement 2d of Contracts § 90(1) as stating that, to prevail on a promissory estoppel claim, plaintiffs must show: (1) a clear and unambiguous promise; (2) a reasonable and foreseeable reliance by the party to whom the promise is made; and (3) an injury sustained by the party asserting the estoppel by reason of his reliance).

With these principles in mind, the district court held that the general retirees could not prevail on their estoppel claims due to "their inability to show that the alleged promises or representations upon which they allegedly relied are 'clear and unambiguous,' or that the statements 'amount[ ] to a representation of material fact.'" *Sprague V,* 857 F.Supp. at 1189 (stating also that the general retirees were unable to show detrimental reliance or that General Motors intended that they act on any representation or promise). The court found that, at best, any promises or representations given to the general retirees were ambiguous, and that any reliance on such statements was "inherently unreasonable and unjustified." *Id.*

Given the fact that we are affirming the district court's finding that the early retirees are entitled to vested health care benefits, there is no need to address the propriety of its alternative holding that the early retirees are entitled to such benefits based on theories of equitable and promissory estoppel. However, because we are holding that the district court erred in its vesting analysis with regard to the general retirees, we now reinstate their estoppel claims.

On remand, the district court must first determine whether the policy and summary plan descriptions applicable to the various groups of general retirees unambiguously reserved General Motors' right to amend the plan. Individuals who retired under docu-ments containing an unambiguous reservation of the right to amend will lose on their estoppel claims because there could be no justifiable reliance in those cases. *See Unisys I,* 58 F.3d at 908 (stating that "a participant's reliance on employer representations regarding benefits may never be 'reasonable' where the participant is in possession of a written document notifying him of the conditional nature of such benefits"); *Gill,* 981 F.2d at 860 (holding that where a plan unambiguously provides that benefits may be modified, "there is simply no factual basis for the application of estoppel"). Estoppel may be a viable theory, however, as to those retirees who retired under documents granting vested benefits or under documents that were ambiguous as to whether benefits were vested. *See Greany v. Western Farm Bureau Life Ins. Co.,* 973 F.2d 812, 821–22 (9th Cir. 1992). Such individuals must be given the opportunity on remand to demonstrate the elements of their estoppel claims.

## V.

■ The plaintiffs also argue that the district court erred in dismissing the breach of fiduciary duty claims of both the general and early retirees in *Sprague I.* The district court did so in reliance on *Adams v. Avondale Indus., Inc.,* 905 F.2d 943, 947 (6th Cir.), *cert. denied,* 498 U.S. 984, 111 S.Ct. 517, 112 L.Ed.2d 529 (1990), a decision of this Court holding that "a company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan." *Sprague I,* 768 F.Supp. at 605.

On appeal, the plaintiffs argue that the district court misapprehended the scope of their fiduciary duty claim. The plaintiffs argue that their breach of fiduciary duty claim was based not only on General Motors' decision to amend the company's welfare benefits plan, but also "encompassed the full range of allegations in the complaint," including misleading communications by General Motors regarding plan administration. (Brief for Sprague at 19).

■ Section 404 of the Employee Retirement Income Security Act sets forth certain fiduciary duties which govern the man-

agement of both pension and welfare benefit plans. For purposes of determining whether fiduciary obligations attach to the activities related to welfare benefits plans, courts have distinguished between the administration of such plans and their establishment, amendment, and termination. Although an employer "clearly must satisfy fiduciary duties when administering benefit plans ... it is equally plain that simply because an employer is also a benefits plan administrator 'ERISA does not require that "day-to-day corporate business transactions, which may have a collateral effect on prospective, contingent employee benefits, be performed solely in the interest of plan participants." ' " *Adams,* 905 F.2d at 947 (citation omitted).

This Circuit has made it clear that an employer's decision to reduce or otherwise modify welfare benefits will not give rise to a breach of fiduciary duty claim under the Employee Retirement Income Security Act. *See id.* (quoting *Musto,* 861 F.2d at 911) (stating that a company "does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan"). As we stated in *Musto,* "[t]here is a world of difference between administering a welfare plan in accordance with its terms and deciding what those terms are to be. A company acts as a fiduciary in performing the first task, but not the second." 861 F.2d at 911. In situations where an employer decides to "establish, amend, or terminate a benefits plan, as opposed to managing any assets of the plan and administering the plan in accordance with its terms, its actions are not to be judged by fiduciary standards." *Id.* at 912; *see also Lockheed Corp. v. Spink,* —— U.S. ——, ——, 116 S.Ct. 1783, 1789, 135 L.Ed.2d 153 (1996) (stating that "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans" and that they do not act as fiduciaries in those situations).

Nonetheless, the Employee Retirement Income Security Act provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries ..." 29 U.S.C. § 1104(a)(1). In exercising those duties, a fiduciary "may

not materially mislead those to whom the duties of loyalty and prudence are owed." *In re Unisys Corp.,* 57 F.3d 1255, 1261 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1316, 134 L.Ed.2d 470 (1996) (*Unisys II* ). This Court has stated:

> Under the exclusion from fiduciary standards for business decisions, corporate actions by plan administrators seeking to reduce the amount of unaccrued plan benefits, terminating a pension plan, and deciding whether or not to establish a plan, have all been found nonfiduciary. Several courts have, however, held that misleading communications to plan participants regarding plan administration (for example, eligibility under a plan, the extent of benefits under a plan) will support a claim for breach of fiduciary duty .... a fiduciary may not materially mislead those to whom the duties of loyalty and prudence described in 29 U.S.C. § 1104 are owed.

*Berlin v. Michigan Bell Tel. Co.,* 858 F.2d 1154, 1163 (6th Cir.1988) (citations omitted).

The Supreme Court recently addressed the issue of whether an employer was acting in a fiduciary capacity for purposes of the Employee Retirement Income Security Act when it misled employees regarding the security of their benefits if they transferred from the company into a new, separately-incorporated subsidiary. *Varity Corp. v. Howe,* —— U.S. ——, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). The Court began its analysis with the language of the statute, which provides that "a 'person is a fiduciary with respect to a plan,' and therefore subject to ERISA fiduciary duties, 'to the extent' that he or she 'exercises any discretionary authority or discretionary control respecting management' of the plan, or 'has any discretionary authority or discretionary responsibility in the administration' of the plan." *Id.* at ——, 116 S.Ct. at 1071 (citing ERISA § 3(21)(A)). The Court found that the employer in that case was both the employer and the benefit plan's administrator, as permitted by the statute. The Court further found that, although "not all of [the company's] business activities involved plan management or administration ... [the company] was exercising 'discretionary authority' re-

specting the plan's 'management' or 'administration' when it made these misrepresentations." *Id.*

The Court held that the company's intentional connection of statements about its subsidiary's financial health to statements about the future of employees' benefits "so that its intended communication about the security of benefits was rendered materially misleading," was an act of plan administration. *Id* at ——, 116 S.Ct. at 1074. The Court further stated: "While it may be true that amending or terminating a plan ... is beyond the power of a plan administrator ... and, therefore, cannot be an act of plan 'management' or 'administration'—it does not follow that making statements about the likely future of the plan is also beyond the scope of plan administration .... plan administrators often have, and commonly exercise, discretionary authority to communicate with beneficiaries about the future of plan benefits." *Id.* Where plan administrators "participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense," they fail to act "solely in the interest of the participants and beneficiaries," and violate the duty of loyalty in Section 404(a)(1) of the Employee Retirement Income Security Act. *Id.*

In a case similar to the one before us, the Third Circuit recently held that a breach of fiduciary duty claim may be maintained where, despite a company's use of reservation clauses, summary plan descriptions contained "for life" language and company representatives misinformed employees that benefits would be continued "for life" after retirement. *Unisys II,* 57 F.3d at 1264. The retirees in that case argued that, even if the company was legally entitled to terminate the plans pursuant to the reservation of right clause, the company had breached its fiduciary duty by affirmatively misleading plan participants regarding the duration of their retiree medical benefits. In ruling that a breach of fiduciary duty claim could be maintained under the circumstances, the Third Circuit stated: "[T]his is not a case involving an employer's 'duty to remind.' Instead, this case is more accurately character-

ized as a dispute over an employer's duty, as an ERISA fiduciary, not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures." *Id.* at 1264.

Because the district court in this case summarily dismissed the plaintiffs' breach of fiduciary duty claim without any consideration of its merits, we reinstate the claim and remand for a determination of whether the plaintiffs are able to maintain their breach of fiduciary duty claim.

## VI.

The plaintiffs argue as well that the district court erred in denying their demand for a jury trial. In *Sprague II,* the district court granted General Motors' motion to strike the plaintiffs' demand for a jury trial on the ground that the legal issues advanced by the plaintiffs substantially mirrored the historically equitable relief sought under the Employee Retirement Income Security Act, and held that the plaintiffs were not entitled to a jury trial under the Act or the Seventh Amendment to the United States Constitution. 804 F.Supp. at 934, 939. The plaintiffs subsequently asked the district court to reconsider that ruling in light of a new Supreme Court case, *Mertens v. Hewitt Assoc.,* 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993), and the district court again denied the plaintiffs' request for a jury trial in *Sprague III,* 823 F.Supp. at 442.

On appeal, the plaintiffs contest the district court's denial of their demand for a jury trial. The plaintiffs dispute the district court's conclusions that the legal issues they advance substantially mirror the historically equitable relief sought under the Employee Retirement Income Security Act, and that the relief they seek is equitable in nature.

The district court's opinions on this issue are thorough and correct, and the plaintiffs raise no new arguments on appeal. We affirm the district court's resolution of this issue based on *Sprague II* and *Sprague III.*

## VII.

Finally, the plaintiffs contest the district court's grant of only limited injunctive relief

against General Motors. We need not address the appropriateness of the injunction because it was only in effect to protect the early retirees pending appeal of this case.

The decisions of the district court are **AFFIRMED** in part and **REVERSED** in part, and the case is **REMANDED** to the district court for proceedings consistent with this opinion.